EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* RAFAEL MARTÍNEZ RIVERA, acusado y apelante.

*Número:* CR-70-25       *Resuelto:* 22 de enero de 1971

*Benicio Sánchez Castaño* y *Gustavo Adolfo del Toro,* abogados del apelante; *Gilberto Gierbolini, Procurador General,* y *Federico Rodríguez Gelpí, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

El apelante fue acusado de infringir el Art. 260 del Código Penal, porque el día 2 de noviembre de 1967 cometió actos impúdicos y lascivos con el cuerpo de la niña de siete (7) años de edad I.M.S.

Por mayoría de 10 a 2 un jurado le declaró culpable de dicho delito y luego de negársele el beneficio de una sentencia

suspendida fue condenado a sufrir de dos (2) a cinco (5) años de presidio. Además fue sentenciado a diez (10) días de cárcel por desacato cometido en corte abierta.

En este recurso de apelación señala la comisión de cinco errores. Como en uno de ellos ataca la suficiencia de la prueba de cargo, transcribiremos el resumen que de la misma hace correctamente el Procurador General en su Informe:

"*Angelina Tolentino,* testigo de cargo, declaró residir en el Barrio Sabana de Las Piedras y haber visto el 2 de noviembre de 1967 de 6 a 6: 30 P.M. a una distancia de 30 pies de su casa un vehículo de motor gris viejo, claro, de dos puertas, con una rueda simulada pintada en el baúl. Declaró haber visto al acusado de perfil conduciendo el vehículo y vio cuando éste se detuvo. Identificó al acusado en sala y retratos del automóvil. Vio y oyó cerrarse la puerta derecha del automóvil. 'Después' identificó el vehículo al detective Ismael Rodríguez, en el estacionamiento del Cuartel de la Policía de Caguas entre cuarenta y cincuenta vehículos. Declaró haber visto a Sandra Ivette Meléndez esa tarde pasar cerca de su casa. (T.E. págs. 5–35.)

*Carmen Delia Laboy Cuadrado,* testigo de cargo, declaró estar el 2 de noviembre de 1967 como a las seis de la tarde frente a la casa de una vecina hablando con una amiga en el Barrio Collores, sitio Sabana, Las Piedras, cuando vio pasar al acusado tres veces frente a ella como a diez pies de distancia conduciendo un automóvil Valient, color gris claro. Este llevaba 'como una rueda atrás'. Era la primera vez que veía al acusado. Al otro día identificó el vehículo en el estacionamiento de vehículos del Cuartel de la Policía de Caguas. Hizo esa identificación estando sola y se la informó al detective Ismael Rodríguez. Había aproximadamente otros veinticinco vehículos en el estacionamiento. Identificó varias fotografías del vehículo. (T.E. págs. 36–46.)

*María Elena Vázquez Lozada,* testigo de cargo, declaró residir en el Barrio Collores, sitio Sabana, de Las Piedras y estar el 2 de noviembre de 1967 entre 6 y 6: 30 de la tarde en la casa de Juan de Dios Rivera en dicho sitio hablando con Angelina Tolentino, esposa de éste. En eso vio pasar al acusado tres veces frente a ellas conduciendo un automóvil Valiant gris con una rueda simulada atrás. Vio al vehículo detenerse, oyó una puerta

cerrarse y vio el pelo de una niña, comentando entonces 'Juan de Dios, parece que se montó una nena en ese carro'. Vio entonces que el vehículo tomó la 'carretera que va hacia el río'. Siguió declarando que regresó a su casa, oyó los gritos de la niña Sandra Ivette Meléndez y de su madre a quienes conocía por vivir frente a su casa. Declaró que se había fijado en el acusado ya que le dijo a su amiga Angelina Tolentino 'mira Angelina, por ahí va un pollo guiando ese carro'. Al día siguiente identificó el vehículo en el estacionamiento del Cuartel de la Policía de Caguas entre aproximadamente 50 vehículos más. Esta identificación la hizo sola a petición del detective Ismael Rodríguez, quien permaneció en el cuartel. No comentó con nadie durante la identificación ni antes de la misma. (T.E. págs. 46–57.)

*Ana María Rodríguez García*, declaró estar el 2 de noviembre de 1967 en el Barrio Collores, sitio Sabana, Las Piedras, hablando con una amiga cuando vio pasar tres veces un automóvil Valiant gris, manejado por el acusado, por la carretera donde ella vivía. Vio al acusado de frente. El carro le llamó la atención porque parecía un sapo y tenía una rueda como de metal atrás. Recuerda que el 2 de noviembre era el día de los muertos. El carro le pasó como a cinco pies de distancia. (T.E. págs. 57–62.)

*Gilberto Ortiz Tolentino*, declaró conocer a la niña Sandra Ivette Meléndez y a sus padres. El 2 de noviembre de 1967 empujaba un vehículo en la Carretera que va del Barrio Collores para Tejas cuando vio a Sandra subir 'por la jalda del río'. Vió que le chorreaba sangre por las piernas y gritaba. Le pidió al testigo que la llevara a su 'mamita' y así lo hizo. El testigo se la echó al hombro y la llevó a la madre. Identificó una camisa y un pantalón manchado de sangre que usaba ese día, declarando que era sangre de la niña. Declaró que la niña le dijo que 'un señor que me cogió y me llevó en el carro y me llevó al río y mire como me puso'. (T.E. págs. 62–68.)

*Josefina Serrano Morales*, madre de la niña perjudicada, declaró haber enviado a su hija a un mandado. Que cuando salió el 2 de noviembre de 1967 de su casa en Las Piedras, llevaba ropa limpia y recién puesta; que cuando se la trajeron chorreaba sangre por las piernas y la ropa estaba manchada de sangre. Declaró que la niña le dijo que un hombre blanco la había

parado para decirle que le traía unos chavos al padre; que la llevó en el carro hacia el puente y que el hombre tenía un carro gris con una rueda atrás. (T.E. págs. 68–76.)

*Ismael Rodríguez*, declaró ser detective. Allá para el 2 de noviembre de 1967 investigó la querella de la niña Sandra Ivette Meléndez. En el curso de la investigación localizó, un día después de los hechos, un automóvil Valiant frente a Delco Aluminum en Caguas, Puerto Rico y a su dueño, el apelante Rafael Martínez Rivera. Siguió declarando que le informó al acusado que estaba investigando un caso, que era necesario identificarle, cosa que se podía hacer en Delco, donde trabajaba el acusado o en el cuartel. El acusado decidió ir al cuartel solo y en su propio carro, el cual estacionó en el estacionamiento del cuartel. Antes de ir al cuartel se le explicó la naturaleza de la investigación y su derecho a asistencia de abogado y a no declarar.

En el cuartel, Martínez Rivera pidió que se llamara al dueño de la Delco. Este vino acompañado del Lcdo. Gonzalo Barreras Varonas. Este conferenció con el apelante. El sospechoso fue enviado entonces para su casa y se le pidió que volviera al día siguiente.

Declaró el testigo que al día siguiente se congregaron en la planta alta del cuartel alrededor de quince policías blancos, vestidos de civil, sin gafas y fueron diseminados por el salón. Entre ellos se situó a Martínez Rivera. Acordaron entonces que la niña Sandra Ivette entraría al salón acompañada por el Lcdo. Sergio Peña Clos. Este abogado había estado acompañando al Sr. Martínez Rivera. La niña entró al salón donde estaban congregados los policías y el acusado y la niña, después de dar vueltas, señaló al acusado. (T.E. págs. 78–93 y 97–105.)

*Dr. Manuel Fernández Mena*, testigo de cargo, declaró haber tratado a Sandra Ivette Meléndez el 2 de noviembre de 1967 en la Clínica Oriente. La niña fue suturada bajo anestesia general de laceraciones en el perineo y en el himen. Declaró que la niña estaba ansiosa y gritando y que permaneció en el hospital seis días. (T.E. págs. 93–95.)

*Sandra Ivette Meléndez*, testigo de cargo y niña de diez años [*sic*] de edad fue sometida por el magistrado a un intenso interrogatorio para determinar su capacidad. Declaró que el 2 de noviembre de 1967 fue enviada como a las 6 de la tarde por su madre a una tienda a comprar 'griffin'; que en el camino se encontró

con el acusado (a quien identificó en el tribunal) quien venía en un automóvil; que el acusado paró el carro y que luego de preguntarle como se llamaban sus padres y dónde vivían le dijo que tenía 'unos chavos' para su padre; que la invitó a montarse para llevarle los 'chavos' a la madre; que ella se montó y él la llevó para un puente y allí le metió dos dedos en el 'pupú' y antes de eso la invitó a recostarse en el carro, cosa que ella no hizo; que se apeó del carro y sangraba; que subió jalda arriba hasta que se encontró con un tal Gilberto a quien le explicó lo que le había pasado y la llevó a su casa. (T.E. págs. 114–128.)" (Informe del Procurador General, págs. 4 a 7.)

En su primer señalamiento sostiene el apelante que el tribunal sentenciador cometió grave error "al permitir que el fiscal violase las disposiciones del *Artículo 11 del Código de Enjuiciamiento Criminal*, al permitir que el Ministerio Público utilizase declaraciones juradas tomadas a testigos de la defensa que habían sido notificados como testigos de defensa en defensa de coartada, habiéndosele tomado declaraciones con posterioridad a la radicación de la acusación en el caso de autos y luego de haberse notificado la defensa de coartada. Siendo esto un error perjudicial a los derechos del acusado y una violación al derecho de un juicio justo e imparcial."

En apoyo de su contención invoca el caso de *Pueblo* v. *Tribunal Superior*, 99 D.P.R. 98 (1970), donde establecimos la prohibición al fiscal de tomarle declaraciones juradas a los testigos anunciados por el acusado como testigos de coartada y utilizarlos en el juicio.

Carece de méritos este señalamiento. La citada doctrina del caso de *Pueblo* v. *Tribunal Superior*, supra, no es de aplicación a los casos como el del apelante, cuyos juicios se celebraron con anterioridad a la mencionada decisión. [1] Además las referidas declaraciones juradas no fueron admiti-

---

[1] Véanse, *Rivera Escuté* v. *Jefe Penitenciaría*, 92 D.P.R. 765 (1965); *Linkletter* v. *Walker*, 381 U.S. 618.

das en evidencia, y si bien el fiscal hizo referencia en la repregunta a algunas de ellas, fue la defensa quien inició su uso, con el aparente propósito de reforzar la credibilidad de dos testigos de descargo. Por otro lado surge de los autos que el apelante no impugnó el uso por el fiscal de las declaraciones juradas por los motivos que más tarde se consignaron en *Pueblo* v. *Tribunal Superior*, supra, ni se nos ha demostrado, ni surge del récord que los derechos fundamentales del acusado fueren perjudicados.

Por el segundo señalamiento se ataca la validez del método seguido para la identificación del acusado como el autor del delito.

■ También carece de mérito. Ya hemos reseñado la prueba de cargo. Varios testigos, aparte de la niña perjudicada, vieron al acusado en la hora y fecha de los hechos conduciendo un automóvil que por sus características especiales no era de difícil identificación. Así quedó demostrado cuando esos testigos, caminando solos por el sitio de aparcamiento del Cuartel de la Policía de Caguas, y sin indicaciones ni ayuda de persona alguna identificaron, sin dificultad, entre más de veinticinco automóviles que allí habían, el que el acusado conducía el día de los hechos y que efectivamente era de su propiedad.

Convenimos con el Procurador General en que la identificación del acusado por la niña perjudicada se hizo bajo condiciones y en circunstancias que protegieron totalmente sus derechos.

La identificación se llevó a cabo en un amplio salón donde se encontraban el acusado y alrededor de quince personas más entre civiles y policías dispersos por el salón y todos vistiendo de civil con ropas parecidas a las usadas por el acusado. Al igual que el acusado, los policías eran blancos, y no usaban gafas. La niña entró al salón acompañada únicamente por el abogado Sergio Peña Clos. Luego de dar vueltas por el salón la niña identificó al acusado como el autor del

delito. En el proceso de identificación el acusado estuvo asistido por dos abogados. La identificación en este caso cumple sustancialmente con las exigencias de ley. Véase *Pueblo* v. *Gómez Incera*, 97 D.P.R. 249 (1969).

Se imputa como cuarto error la negativa del tribunal sentenciador a concederle al apelante los beneficios de una sentencia suspendida. En la discusión del error alega el apelante que el tribunal a quo venía obligado a permitirle examinar el informe del Oficial Probatorio y a formular objeciones contra el mismo.

■ Ya hemos resuelto que el disfrute de una sentencia suspendida es un privilegio y no un derecho, *Pueblo* v. *Bruno*, resuelto en 30 de septiembre de 1963 y que ni los jueces vienen obligados por el informe del oficial probatorio, *Pueblo* v. *Emmanuelli*, 67 D.P.R. 667 (1947), ni es indispensable para que el juez determine la procedencia de la sentencia suspendida, *Pueblo* v. *Arce Valentín*, 88 D.P.R. 859 (1963), bastando que el juez ejerza su discreción al hacer la determinación. *Pueblo* v. *Sánchez González*, 90 D.P.R. 197 (1964).

■ Al igual que en otras jurisdicciones resolvemos que dicho informe es confidencial[2] y que no se viola el debido proceso de ley por el hecho de que el tribunal considere dicho informe sin darle oportunidad al acusado de rebatir su contenido. *Gregg* v. *United States*, 394 U.S. 489; *United States* v. *Trigg*, 392 F.2d 860; *Baker* v. *United States*, 388 F.2d 931; *Thompson* v. *United States*, 381 F.2d 664; *Hoover* v.

---

[2] *Colón* v. *Meléndez*, 87 D.P.R. 442 (1963), invocado por el apelante, no es aplicable. Allí se trataba de un informe sobre un estudio requerido por el tribunal a una especialista en relaciones de familia sobre las condiciones de dos hogares, el del padre y el de la madre de 4 menores de edad, a fin de determinar cuál de los dos hogares sería el más adecuado para garantizar el bienestar de los niños.

El tribunal consideró ese informe al adjudicar la custodia de los niños a una de las partes, dentro de un procedimiento de hábeas corpus. Obviamente el informe no podía ser confidencial y ambas partes tenían derecho a examinarlo y hacer objeciones al mismo.

*United States,* 268 F.2d 787; *Williams* v. *New York,* 337 U.S. 241.

Tiene razón el Procurador General al argumentar que "el propósito de tratar como confidencial el informe del oficial probatorio es proteger a las personas que ofrecen información sobre el acusado y lograr así que esas personas sean más accesibles y se sientan con mayor libertad para prestar testimonio durante la investigación que practica el oficial probatorio sobre los antecedentes de familia e historia social del convicto. Para lograr esto es necesario que los nombres de las personas entrevistadas así como la información por ellas suministrada sea mantenida en forma confidencial, pues de otro modo se afectarían adversamente las investigaciones practicadas por los oficiales probatorios, todo ello en perjuicio de los propios acusados y de los fines que persigue la ley que autoriza las sentencias suspendidas. Además, el permitir el examen y refutación del informe del oficial probatorio y permitir que las personas que hayan brindado alguna información sean contrainterrogadas en corte derrotaría el propósito de ese informe pues ello tendría el efecto de extender el proceso hasta el extremo en que el informe ya no sería de utilidad para guiar al tribunal en el ejercicio de su discreción. De todos modos, hay que tener en cuenta que el informe no es preparado por un adversario; que el tribunal está consciente y considera el hecho de que el informe contiene información de referencia; y que el acusado puede traer a la intención del tribunal cualquier factor que estime pueda influenciar su decisión. *People* v. *Peace,* 273 N.Y.S.2d 64 (1966); *People* v. *Mosher,* 5 Cr. L. 2062 (N.Y. 4-10-69); *Commonwealth* v. *Martin,* 4 Cr. L. 2481 (Mass. 2-4-69)." (Informe Procurador General, págs. 12 y 13.)

■ El quinto y último error no fue cometido. El procedimiento de desacato se ajustó a la ley. El 13 de marzo de 1969 el juez encontró culpable al acusado y le sentenció a 10 días de cárcel. Ese mismo día y ya convicto el acusado

de violar el Art. 260 del Código Penal, a petición de la defensa, el juez dejó sin efecto la sentencia de desacato y fijó una fecha posterior para su lectura. El 12 de junio de 1969 el acusado volvió a ser sentenciado a cumplir 10 días de cárcel por desacato, describiéndose en la referida sentencia los actos constitutivos del desacato, sus circunstancias y lugar y que los actos tuvieron lugar durante el juicio celebrado al acusado. Véanse *Ramos* v. *Rivera,* 68 D.P.R. 548 (1948) y *Coll Moya* v. *Alcaide, Cárcel Municipal,* 89 D.P.R. 225 (1963).

*Se confirmarán las sentencias apeladas.*

El Juez Presidente, Señor Negrón Fernández y el Juez Asociado, Señor Santana Becerra, no intervinieron.