EL PUEBLO DE PUERTO RICO, apelado, *v.* JULIO A. MÁRQUEZ DÍAZ y ESTEBAN BERMÚDEZ BERRÍOS, apelantes.

*Números:* CR-86-82   *Resueltos:* 30 de junio de 1988
CR-86-83

*Francisco M. López Romo, José Hernández Sosa* y *Max Pérez Preston,* abogados de los apelantes; *Norma Cotti Cruz, Subprocuradora General,* y *Marjorie Rivera Rodríguez, Procuradora General Auxiliar,* abogados de El Pueblo.

La Juez Asociada Señora Naveira de Rodón emitió la opinión del Tribunal.

Hoy nos toca nuevamente considerar un caso que refleja penosamente el deterioro de valores en el desempeño de la función pública. Por la naturaleza de los actos delictivos que hoy examinamos creemos que es importante pronunciarnos mediante opinión. Una mayor divulgación servirá como elemento aleccionador e instrumento de disuasión. Este tipo de conducta antisocial mina la fe del Pueblo en el Gobierno y sus efectos nocivos permean los intersticios de la madeja social, resquebrajando el delicado equilibrio que debe existir entre los intereses del individuo y los mecanismos de coexistencia y convivencia comunitaria.

Este caso surge como resultado de una investigación realizada por la Unidad para Combatir la Corrupción del Departamento de Justicia, sobre la cancelación de ciertas deudas contributivas. Los apelantes Julio A. Márquez Díaz y Esteban Bermúdez Berríos fueron acusados por el delito de oferta de soborno, Art. 212 del Código Penal de 1974 (33 L.P.R.A. sec. 4363). Juzgados por tribunal de derecho resultaron convictos y el 17 de octubre de 1986 fueron sentenciados a cumplir ocho (8) años de presidio. Se les concedió los beneficios de la Ley de Sentencias Suspendidas. No con-

formes apelaron ante este Tribunal. Plantearon, en síntesis, que el tribunal de instancia erró al admitir en evidencia la identificación de los apelantes y, al encontrarlos culpables, sin que se hubiera probado la culpabilidad más allá de duda razonable.

## I

Los testigos de cargo fueron Ramón Román, Francisco Rojas Calderón, Octavio Jiménez y Víctor M. Rivera.

El Sr. Ramón Román declaró que es parte de la sucesión Pilar Villegas y que ésta adeuda cinco mil ciento cincuenta y siete dólares con cincuenta y cinco centavos ($5,157.55) al Departamento de Hacienda por concepto de contribuciones sobre propiedad inmueble. Los miembros de la sucesión le entregaron el dinero, mayormente en efectivo, para pagar las contribuciones. El 24 de noviembre de 1982 llamó al acusado apelante Bermúdez Berríos, le entregó el dinero y solicitó que le hiciera el favor de llevarlo a la colecturía. Bermúdez Berríos también pertenece a la sucesión y había aportado dinero para el pago de las contribuciones. Esa misma tarde Bermúdez Berríos le trajo los recibos de pago. Él los guardó.

En el contrainterrogatorio atestó que conocía al acusado apelante Bermúdez Berríos desde que nació. Además de ser vecinos, éste era primo de su esposa. También indicó que su decisión de solicitarle que llevara el dinero a la colecturía fue hecha de momento. La misma no pudo haber sido anticipada por el acusado apelante Bermúdez Berríos.

Al próximo testigo, Francisco Rojas Calderón, el Departamento de Justicia le concedió inmunidad. Declaró que fue empleado del Departamento de Hacienda de 1979 a 1984. Para la época en que ocurrieron los hechos era supervisor de la Sección de Cheques Devueltos. Antes del 23 de noviembre de 1982 no conocía a los acusados apelantes Márquez Díaz y Bermúdez Berríos. Ese día recibió una llamada del acusado

apelante Márquez Díaz invitándolo a reunirse a las 7:00 P.M. en el centro comercial que queda frente a la fábrica Grana en Guaynabo. El acusado apelante Márquez Díaz le explicó que el propósito de la reunión era para pedirle que sustrajera un cheque que por insuficiencia de fondos iba a recibir en su sección. Asistió a la reunión y allí conoció al acusado apelante Márquez Díaz quien estaba acompañado del coacusado apelante Bermúdez Berríos. Márquez Díaz le entregó una tarjeta de presentación que tenía impreso lo siguiente: Julio A. Márquez, Director de Presupuesto, Municipio de Guaynabo; una dirección postal, dos (2) teléfonos y un escudo.(1) El arreglo que le propusieron fue que sustrajera el cheque y luego lo entregara al acusado apelante Márquez Díaz. Por ésto recibiría mil dólares ($1,000). Le dieron un papel con el nombre de Julio A. Márquez y la cantidad del cheque, cinco mil ciento cincuenta y siete dólares con cincuenta y cinco centavos ($5,157.55). No lo conservó; lo rompió. Dos (2) o tres (3) semanas más tarde recibió el cheque. Procedió a llamar al acusado apelante Márquez Díaz. Luego le entregó el cheque y recibió ochocientos dólares ($800). Quedaron a deberle doscientos dólares ($200). También en esta ocasión el coacusado apelante Bermúdez Berríos acompañó a Márquez Díaz. Continuó declarando Rojas Calderón que al sustraer el cheque la deuda de la sucesión Pilar Villegas aparecía en el Departamento de Hacienda como saldada.

En el contrainterrogatorio declaró que vio a los acusados apelantes en esas dos (2) ocasiones y que sólo los volvió a ver cuando se sometieron los casos tres (3) años más tarde, en noviembre de 1985. No hubo identificación por fotografías ni rueda de confrontación. Vio a los acusados apelantes por unos quince (15) minutos en la primera ocasión y unos diez (10) minutos en la segunda. Tanto en la declaración jurada

---

(1) Esta tarjeta fue sometida en evidencia como *exhibit* 7 del Ministerio Público.

prestada el 9 de octubre de 1985, como en su testimonio en corte, manifestó que el coacusado apelante Bermúdez Berríos era bajito, "por lo menos, dos o tres pulgadas" menos que él. Al parársele al lado comprobó que ambos medían igual.

Continuó atestando que al ver al acusado apelante Márquez Díaz y éste darle la tarjeta con su nombre se dio cuenta, por el parecido, que era hermano de un compañero suyo de trabajo en la Colecturía de Guaynabo de nombre José A. Márquez Díaz. Añadió que ni José mencionó a su hermano Julio ni éste a José. Conoce a José A. Márquez Díaz por el señor Guadalupe, una de las personas con quien había hecho transacciones para sacar cheques del Departamento de Hacienda. El señor Guadalupe fue testigo en su contra en relación con unas acusaciones. Declaró que es propietario de una tienda de equipo de música, Home Electronic, establecida en Carolina con el dinero obtenido de transacciones ilícitas relacionadas con la sustracción de cheques del Departamento de Hacienda.. El Sr. José A. Márquez Díaz fue cliente de su tienda.

El Sr. Octavio Jiménez testificó que en 1982 era Auxiliar de Cobrador en la Colecturía de Guaynabo. Fue la persona que preparó los recibos de pago de contribuciones pagadas con el cheque sustraído. Identificó sus iniciales en los recibos. Expresó que el cheque se pagó por correo o por la oficina, no por la ventanilla. Después que preparó los recibos los entregó al Sr. José A. Márquez, compañero de trabajo y amigo. Luego "[ll]egaron a Colecturía los co-acusados Julio Márquez [Díaz] y Esteban Bermúdez [Berríos]; y José les entreg[ó] los recibos". Eso fue el 24 de noviembre del 1982.

En el contrainterrogatorio atestiguó que conoce al señor Guadalupe. Éste es compañero de trabajo en la colecturía. Recibió el cheque el 23 de noviembre de 1982 e hizo los recibos el 24 de noviembre. El cheque se lo entregó a la señora Eliza o a la señora Raquel. Continuó declarando que existe

un libro en la colecturía donde se dan entrada a los cheques recibidos en orden cronológico.

Con respecto al testigo Víctor M. Rivera, Agente Especial del Negociado de Investigaciones Especiales del Departamento de Justicia, se estipuló que su declaración consistiría en lo contenido en el memorando al expediente que éste preparó en relación con la investigación del caso. En síntesis, en dicho memorando se expresa que el acusado apelante Bermúdez Berríos le informó que había pagado los cinco mil ciento cincuenta y siete dólares con cincuenta y cinco centavos ($5,157.55) en contribuciones relacionadas con la sucesión Pilar Villegas. El pago lo hizo principalmente con dinero en efectivo en la ventanilla de la Colecturía de Guaynabo. Allí le entregaron los recibos correspondientes. También informó que desconocía la procedencia del cheque Núm. 208 del Sr. Julio A. Márquez Díaz, a nombre del Secretario de Hacienda, por la misma cantidad.

La defensa presentó como testigos a la Sra. Carmen M. Eliza, al agente Víctor Rivera, al Sr. José Márquez Díaz y al coacusado apelante Julio A. Márquez Díaz.[2]

La señora Eliza testificó que es Administradora del Área de San Juan del Departamento de Hacienda y que para noviembre de 1982 se desempeñaba como Colector de Rentas Internas XI en Guaynabo. Manifestó que no conocía y nunca había visto a los acusados apelantes Márquez Díaz y Bermúdez Berríos. Declaró que el libro de registro de cheques lo llevaba la Sra. Sonia Greytes. Se enteró que ésta "había pasado páginas de ese registro cuando al . . . faltar[,] otras personas hacían [las] anotaciones". Como supervisora, al enterarse "le dijo que no lo hiciera más". No recordó haberle

---

[2] Los acusados apelantes también presentaron como testigos de buena reputación al Sr. José H. Piñero, Director de Personal del Municipio de Guaynabo, al Hon. Alejandro Cruz Ortiz, Alcalde de Guaynabo, al Lcdo. Alfonso Miranda Cárdenas y al Hon. Salomón Rondón, Representante a la Cámara.

dicho al agente Rivera que el cheque Núm. 208 se recibió por ventanilla.

Por su parte, el agente Rivera testificó que la señora Eliza durante una de las entrevistas le informó que el cheque se recibió por ventanilla. También expresó que la señora Freytes había admitido que había destruido el Registro de Cheque de 23 y 24 de noviembre de 1982 y lo había sustituido con otro. Según ella, esto lo hizo porque "ella era meticulosa y quería tener ese Registro siempre limpio", pero que el documento original y el sustituido eran idénticos.

El Sr. José A. Márquez Díaz declaró que es hermano del acusado apelante Julio A. Márquez Díaz. Conocía al señor Guadalupe y al señor Rojas Calderón, pero no al coacusado apelante Bermúdez Berríos. Corroboró que compró por ochocientos dólares ($800) en efectivo un equipo de música al señor Rojas Calderón. Para el mes de noviembre de 1982 ganaba un sueldo bruto de alrededor de quinientos setenta y cinco dólares ($575) mensuales. Se negó "a contestar pregunta alguna sobre negocios que pudo tener con el Sr. Francisco Rojas [Calderón]".

En su testimonio, el acusado apelante Márquez Díaz aseveró que por primera vez conoció al señor Rojas Calderón en noviembre del 1985. Al coacusado apelante Bermúdez Berríos, para noviembre de 1982, lo conocía de vista, pero no había hablado o socializado con él. Expresó que todo lo declarado por el señor Rojas Calderón era falso; que nunca se reunió con él. Respecto al cheque Núm. 208 por cinco mil ciento cincuenta y siete dólares con cincuenta y cinco centavos ($5,157.55) indicó que era suyo, pero que no eran ni su letra ni su firma[3] y que él no autorizó su expedición. Tam-

---

[3] Se estipuló el informe del perito de documentos y calígrafo, Sr. Evaristo Álvarez, el cual indica "que no pudo llegar a una conclusión definitiva en cuanto a la identificación de la persona que hizo el cheque debido a que la reproducción

bién declaró que acostumbraba dejar la chequera en su bulto, en la oficina o en el carro. Continuó atestiguando que al recibir el estado de cuenta mensual de su banco "se dio cuenta de que había un cheque girado por la cantidad de $5,157.55, el cual no fue honrado por el Banco y pensó que había sido un error del Banco y no hizo más ninguna gestión". Sobre las tarjetas de presentación manifestó que fueron preparadas sin su consentimiento, que los números de teléfono no eran los suyos y que por esa razón no las usó. Las guardó en su escritorio. No conoce al testigo Octavio Jiménez; lo vió por primera vez el día que se sometió el caso.

Entre los documentos admitidos en evidencia se encuentran dieciocho (18) recibos de pago de contribuciones modelo 904,[4] ocho (8) recibos de pago de contribuciones modelo 848 preparados por el testigo Octavio Jiménez,[5] la declaración jurada de éste de 15 de octubre de 1985[6] y la del testigo Francisco Rojas Calderón de 9 de octubre de l985,[7] ambas prestadas ante el fiscal José Alcover García.

En la Minuta de 4 de agosto de 1986 se hizo constar que, amparándose en la Regla 242 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, el apelante Márquez Díaz solicitó, por estar viciada, la supresión de la identificación que de él hizo el testigo Rojas Calderón. Alegó que transcurrieron aproximadamente tres (3) años desde que ocurrieron los hechos, hasta que el testigo volvió a ver a los apelantes el día que se sometió el caso.[8]

---

(fotocopia del cheque) contenía limitaciones en la calidad de líneas y definición gráfica en general".

[4] *Exhibit* 5 del Pueblo.

[5] *Exhibit* 6 del Pueblo.

[6] *Exhibit* 1A del apelante.

[7] *Exhibit* A de ambas partes.

[8] De los autos originales del caso no aparece que el coacusado apelante Bermúdez Berríos hubiese hecho un planteamiento similar.

## II

Los acusados apelantes Márquez Díaz y Bermúdez Berríos plantean como error que la identificación que hiciera el testigo Rojas Calderón, único testigo que los conecta directamente con la comisión de los hechos, está viciada y debió suprimirse. Señalan que no le mostraron fotografías ni llevaron a cabo una rueda de detenidos y que Rojas Calderón sólo observó a los apelantes, a quienes no conocía previamente, durante un corto lapso de tiempo, tres (3) años antes. En cuanto al apelante Bermúdez Berríos, también adujeron que Rojas Calderón lo describió erróneamente en la declaración jurada. Además, plantearon que incidió el tribunal al encontrarlos culpables, ya que no se probó la culpabilidad más allá de duda razonable. No les asiste la razón.

La norma vigente en relación con la confiabilidad de una identificación es que la misma depende de la totalidad de las circunstancias. Entre los "factores principales que deben guiar la posibilidad de un error de identificación [están] la oportunidad que tuvo el testigo de observar al ofensor al tiempo en que cometía el crimen, el grado de atención del testigo, la corrección de la descripción previa del criminal por el testigo, el nivel de certeza demostrado por el testigo en la confrontación, y el tiempo transcurrido entre el crimen y la confrontación". *Pueblo v. Peterson Pietersz*, 107 D.P.R. 172, 183 (1978); *Pueblo v. Rodríguez Maysonet*, 119 D.P.R. 302 (1987).

Analicemos la prueba para determinar si de la totalidad de las circunstancias surge que la identificación fue confiable. El testigo Rojas Calderón estuvo con los apelantes en dos (2) ocasiones. La primera por espacio de aproximadamente quince (15) minutos, como a las 7:30 de la noche, en un sitio "alumbrado . . . bien claro" en el estacionamiento de un centro comercial "frente [a] un Burguer [sic] King [que] es-

taba abierto y alumbrado".(⁹) La segunda reunión se llevó a cabo a las 4:00 P.M. en una tarde "bien clar[a]"(¹⁰) y duró aproximadamente diez (10) minutos.

En relación con el apelante Bermúdez Berríos, la discrepancia que hubo en la descripción gira alrededor de la estatura de éste. En la declaración jurada Rojas Calderón lo describió como más "bajito" que él ("dos o tres pulgadas más bajito"), y resultó ser de su mismo tamaño (cinco pies once pulgadas (5′11″)). Esto, por sí solo, no vicia la identificación de tal forma que la haga no confiable. El apelante no hace referencia al resto de la descripción hecha por el testigo, por lo que presumimos que es correcta. Indicó que la persona que estaba con el coacusado Márquez Díaz era "trigueña, con un pelo con mucha vuelta[,] bajito, como un '[*curly*]', y como de unos 35 años". Añadió que lo podía identificar. *Exhibit* A.

También hay que tomar en consideración que las acusaciones en este caso no son el producto de un incidente aislado. Culminan una investigación sobre corrupción de empleados públicos realizada por la Unidad para Combatir la Corrupción del Departamento de Justicia. Cabe señalar, además, que no fue la única prueba que los conectó con la actuación delictiva. Veamos.

El testigo Ramón Román declaró que conoce al apelante Bermúdez Berríos desde que éste nació. Además de ser su vecino, éste es primo de su esposa. Román le entregó a Bermúdez Berríos el dinero, mayormente en efectivo, para pagar las contribuciones. Este dinero fue instrumento esencial; el eje central del delito cometido. Bermúdez Berríos luego le entregó los recibos que supuestamente evidenciaban el pago de la contribución. El testigo Octavio Jiménez, por su parte, atestiguó que el 24 de noviembre de 1982 los apelantes fue-

---

(⁹) *Exhibit* A de ambas partes, declaración jurada prestada por el testigo Rojas Calderón el 9 de octubre de 1985.

(¹⁰) Íd.

ron a la colecturía y el hermano del apelante Márquez Díaz le pidió que adelantara el proceso de preparar los recibos contributivos. Él los preparó y entregó al hermano del apelante Márquez Díaz. Observó cuando éste los entregó a los acusados apelantes. Los recibos fueron admitidos en evidencia. Con éstos se estableció el pago de la contribución con el cheque Núm. 208. Respecto a este cheque, el apelante Márquez Díaz indicó que era suyo, pero que no era ni su letra ni su firma. Sin embargo, en su estado de cuenta bancaria mensual aparecía un cheque por la misma cantidad no honrado por el banco. Su única explicación de este hecho fue que creyó que era un error del banco. De manera poco usual, no hizo gestión alguna para inquirir sobre este asunto.

Luego de dirimida la credibilidad, de la totalidad de las circunstancias surge que a los apelantes se les conectó plenamente con el delito de oferta de soborno y que la identificación fue confiable. El primer error no se cometió.

### III

■ El Art. 212 del Código Penal de 1974, *supra*, oferta de soborno, dispone:

> Toda persona que directamente o por persona intermedia diere o prometiere a un funcionario o empleado público, o jurado, o árbitro, o cualquier otra persona autorizada en ley para oír o resolver una cuestión o controversia, o a un testigo, dinero o cualquier beneficio, con el fin previsto en las secs. 4360 a 4362 de este título, será sancionada con la pena de reclusión fijada en la sección correspondiente.

■ Recientemente, en *Pueblo v. Bigio Pastrana*, 116 D.P.R. 748, 756 (1985), tuvimos la oportunidad de examinar los contornos del "delito de oferta de soborno en su modalidad de darle o prometerle a un funcionario o empleado público, directamente o a través de un intermediario, dinero o cualquier beneficio para que realizara un acto regular de su cargo o función . . .". Expresamos que los elementos esen-

ciales de este delito son: "1. dar u ofrecer dinero o cualquier beneficio; 2. que la dación u ofrecimiento se haga a un funcionario o empleado público, ya sea directamente a él o a través de un intermediario, y 3. que la dación u ofrecimiento se haga con el propósito de que dicho empleado o funcionario realice un acto regular de su cargo o función." (Escolios omitidos.) Íd., págs. 757–758.

De un balance racional y justiciero de la totalidad de la prueba presentada, tanto directa como circunstancial, aun sin tomar en consideración la identificación efectuada por el testigo Rojas Calderón, se puede razonablemente inferir que los apelantes llevaron a cabo el plan para defraudar al erario. Prometieron y le dieron a un empleado público dinero para lograr este fin. El plan consistía en pagar las contribuciones con un cheque sin fondos, obtener los recibos que acreditaban el pago y, una vez devuelto el cheque al Departamento de Hacienda, sustraerlo. De esta ingeniosa manera la deuda contributiva aparecía como saldada en el Departamento de Hacienda sin que se hubiese efectuado el pago. Para que este plan pudiese tener éxito era indispensable que se emitiesen los recibos de pago oficiales y que un empleado del Departamento de Hacienda sustrajese el cheque al ser éste devuelto por el banco por falta de fondos. El plan se llevó a cabo sobornando precisamente al Supervisor de la Sección de Cheques Devueltos, Rojas Calderón. No cabe duda que los hechos probados configuran plenamente el delito de oferta de soborno.

■ Ante el tribunal desfiló prueba suficiente que, de ser creída como lo fue, conectó a los apelantes con los hechos y estableció todos los elementos del delito de oferta de soborno. La culpabilidad quedó probada mas allá de duda razonable. El tribunal dirimió credibilidad y, en ausencia de pasión, prejuicio o parcialidad, no intervendremos con las

determinaciones que hizo el juzgador de los hechos. *Pueblo
v. Cabán Torres*, 117 D.P.R. 645 (1986); *Pueblo v. Miranda
Ortiz*, 117 D.P.R. 188 (1986); *Pueblo v. Borrero Robles*, 113
D.P.R. 387 (1982); *Pueblo v. Millán Meléndez*, 110 D.P.R.
171 (1980); *Pueblo v. López Pérez*, 106 D.P.R. 584 (1977).

Por todo lo antes expuesto, *se dictará sentencia que con-
firme la aquí apelada.*

El Juez Asociado Señor Rebollo López disiente sin opi-
nión escrita.