EL PUEBLO DE PUERTO RICO, apelado *v.* JOSÉ A. TORRES RIVERA, acusado y apelante.

*Número:* CR-93-34          *Resuelto:* 2 de diciembre de 1994

*Cándida Valdespino Zapata* y *Rebecca Viera Trenche*, abogadas del apelante; *Carlos Lugo Fiol, Subprocurador General,* y *Rose Mary Corchado Lorent, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR FUSTER BERLINGERI emitió la opinión del Tribunal.

Tenemos la ocasión de reiterar importantes principios y normas de derecho y procedimiento penal, al aplicarlas integradamente en el contexto particular del caso ante nos.

I

El apelante, José Armando Torres Rivera, fue acusado ante el Tribunal Superior, Sala de Carolina, por los delitos de violación,[1] secuestro agravado,[2] sodomía,[3] robo[4] y por violaciones a los Arts. 6, 7 y 32 de la Ley de Armas de Puerto Rico.[5] Luego de haberse celebrado el juicio por jurado, el acusado fue hallado culpable de los delitos impu-

---

[1] Art. 99 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4061.

[2] Art. 137(a) del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4178(a).

[3] Art. 103 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4065.

[4] Art. 173 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4279.

[5] 25 L.P.R.A. secs. 416, 417 y 442.

tados y fue sentenciado a cumplir cinco penas consecutivas para un total de 224 años de reclusión.([6])

Los hechos se exponen a continuación, según surgen de la exposición narrativa de la prueba. La joven E.B.R. regresó a su residencia de un ensayo a las doce de la medianoche y estacionó su automóvil en la orilla de la acera, frente a su casa. Se bajó del vehículo, sacó las llaves y se dirigió a la marquesina de su casa. Luego de abrir los dos portones de ésta, regresó al automóvil, se montó en él y procedió a estacionarlo dentro de la marquesina. La luz de la marquesina estaba encendida y era bastante potente. Una vez aparcó el automóvil en la marquesina, lo apagó, salió de éste y se fue a cerrar los portones. Mientras bajaba la rampa de la marquesina, aparecieron tres individuos enmascarados. Éstos la apuntaron con un arma de fuego y la obligaron a entrar de nuevo a su automóvil. El acusado, José Armando Torres Rivera, ocupó el asiento del conductor. Intentó poner el auto en marcha, pero no lo logró hacer debido a que éste tenía un mecanismo de seguridad que interrumpía la corriente eléctrica, conocido como "corta corriente". La víctima le dijo al acusado que el automóvil no funcionaba, que se había dañado. En ese momento, la víctima se encontraba entre el acusado, quien ocupaba el asiento del conductor, y Fabián Rivera Rivera, quien ocupaba el asiento al lado del conductor. El tercer individuo se encontraba en el asiento de atrás. Como Torres Rivera no lograba poner el automóvil en marcha, le gritó a la víctima que lo hiciera ella, que ella sabía cómo hacerlo. Ella le acercó las manos al rostro (que ya en ese

---

([6]) Según surge de la prueba, el acusado fue sentenciado a cumplir de manera consecutiva las penas de 50 años por el delito de violación; 99 años por el de secuestro; 20 años por el de sodomía; 50 años por el de robo, y 5 años por infracción a la Ley de Armas de Puerto Rico, Ley Núm. 17 de 19 de enero de 1951 (25 L.P.R.A. sec. 411 *et seq.*). A éste se le impusieron, además, dos penas adicionales por infracciones a la Ley de Armas de Puerto Rico, una de 5 años y otra de 6 meses, que debían de ser cumplidas de manera concurrente con la otra impuesta por la misma infracción y de manera consecutiva con las demás, para un total de 224 años consecutivos de reclusión.

momento tenía al descubierto) y le dijo: "por favor, no prende". El acusado se desesperó. Entonces, Rivera Rivera sacó a la víctima del automóvil y, luego, fuera de la marquesina. El acusado la agarró por un brazo y Rivera Rivera por el otro. Ella se resistió y se agarró de la verja del vecino. El tercer individuo siempre estuvo detrás de uno de los otros dos, por lo que la víctima no pudo verlo con claridad. Mientras la víctima se resistía, ésta le preguntó para qué querían el automóvil. Ellos contestaron que tenían que huir porque los estaban buscando para matarlos; que no le harían daño a ella; que ellos la iban a dejar en otro lugar y luego le devolverían el automóvil. La víctima entonces accedió a poner el automóvil en marcha. Así lo hizo y, luego de ello, el acusado y los otros individuos que estaban allí, levantaron a la víctima por encima del asiento del conductor y la pasaron a la parte de atrás del automóvil, junto con el acusado, quien esta vez ocupaba ese asiento. Rivera Rivera entonces ocupó el asiento del conductor y salieron de la casa de la víctima. En el trayecto, el acusado comenzó a manosear a la víctima. Se dirigieron hacia un manglar cerca de la Base Muñiz en Carolina. Allí sacaron a la víctima del vehículo, la despojaron de su ropa y procedieron a violarla y sodomizarla. Cada uno de los agresores tomó su turno para satisfacer sus instintos, mientras obligaban a la víctima a masturbar a los otros. Mientras esto ocurría, se acercó un vehículo y los agresores huyeron. El vehículo resultó ser del Agente Pedro L. Pagán, quien estaba por allí de ronda. Al ver a E.B.R., la ayudó a salir del lugar. En ese momento, la víctima describió a uno de los agresores como uno de pelo negro largo hasta el hombro, bigote negro y delgado, de aproximadamente 23 años de edad, quien vestía bermudas blancos; a otro como de pelo oscuro, bigote pequeño y delgado, de aproximadamente 22 años de edad, quien llevaba puesto unos pantalones largos de tono claro (blanco, gris o crema). Al tercero no lo pudo identificar. La víctima fue llevada al

cuartel, donde repitió lo que había ocurrido y dio la descripción de los atacantes. Más tarde fue a un hospital, acompañada de sus parientes. Allí fue examinada por un doctor.

Luego de ocurridos estos hechos, la agente Carmen Quiñones, de la Unidad de Delitos Sexuales del Cuerpo de Investigaciones Criminales (en adelante C.I.C.), inició una investigación. Como parte de ella, buscó información en el vecindario donde vivía la víctima y entrevistó a personas del área. Dicha investigación la condujo al acusado, a quien citó para una rueda de detenidos.[7] La rueda se señaló para el 16 de noviembre de 1990 en las oficinas del C.I.C. La agente Quiñones fue a un Hogar Crea para ver si había personas que se parecieran al sospechoso, los encontró y los utilizó para la rueda. Se efectuó la rueda y se colocó a los integrantes delante de una cabina que tenía un cristal amplio. Del otro lado del cristal se encontraban la víctima, el padre del acusado, la agente Quiñones y el Agente Edwin Vázquez. La víctima procedió a observar a los sospechosos. Luego le solicitó al agente Vázquez que le pidiese a los sospechosos que dijesen unas palabras. El agente Vázquez les ordenó que dijeran "soy de San José". Después que los miembros de la rueda hablaron, la víctima los estudió con detenimiento e identificó al acusado como su agresor. Posteriormente, se celebró una vista sobre renuncia de jurisdicción sobre el acusado, por ser éste menor de edad, ante el Tribunal Tutelar de Menores. La renuncia fue declarada con lugar, y se ordenó el traslado de los casos a la jurisdicción del Tribunal Superior, para que el apelante fuese juzgado como adulto, y se presentaron las acusaciones correspondientes. Celebrado el juicio por jurado, éste rindió un veredicto de culpabilidad.

---

. [7] Durante la investigación, la agente Quiñones obtuvo una foto del acusado y la utilizó para mostrarla a las personas del vecindario. No obstante, la agente señaló que en ningún momento la víctima vio la fotografía, la cual destruyó antes de celebrarse la rueda de detenidos.

Inconforme con el veredicto, el acusado apeló ante nos y alegó los siguientes señalamientos de error:

1. Erró el Tribunal de instancia al no concederle a la defensa el tiempo mínimo a que tenía derecho el acusado para prepararse adecuadamente para el juicio.

2. Erró el Tribunal de instancia al no suprimir la identificación del acusado.

3. Erró el Tribunal al declarar culpable y convicto al acusado cuando no se probó su conexión con los delitos imputados más allá de duda razonable.

4. Erró el Tribunal al no concederle los beneficios de una sentencia suspendida y al imponer todas las penas con el máximo de agravantes y consecutivas para un total de 224 años de reclusión, no obstante ser el acusado menor de edad y primer ofensor.

Habiendo sometido las partes sus alegatos, procedemos a resolver.

## III

En su primer señalamiento de error, el apelante alega que la negativa del foro a quo a suspender el inicio del juicio constituyó una limitación irrazonable que menoscabó su derecho a confrontar la prueba en su contra, a tener una adecuada y efectiva representación legal y a tener un juicio justo e imparcial. No le asiste la razón.

■ Aunque hemos sostenido y sostenemos que el derecho a la asistencia de abogado incluye tener disponible un tiempo razonable para que el abogado pueda entrevistarse con el acusado y para que pueda prepararse para el juicio,[8] dicho derecho no puede ser utilizado por el acusado para obstaculizar el trámite normal de las causas. *Romero v. Jones, Alcaide*, 78 D.P.R. 572, 577 (1955). Lo que constituye tiempo razonable varía de acuerdo con las circunstancias de cada caso en particular, según el grado de sencillez

---

[8] *Pueblo v. Pardo Toro*, 90 D.P.R. 635 (1964); *Pueblo v. Rodríguez Correa*, 88 D.P.R. 653 (1963).

o complejidad de cada uno. *Pueblo v. Pardo Toro*, 90 D.P.R. 635 (1964); *Pueblo v. Rodríguez Correa*, 88 D.P.R. 653 (1963).

La representación legal del apelante en el caso de autos tuvo una amplia oportunidad para prepararse para el juicio. Entró en contacto con el caso desde diciembre de 1990, cuando entrevistó al apelante para determinar si éste cualificaba para recibir los servicios de Asistencia Legal. A petición de la propia defensa, la vista preliminar fue celebrada el 23 de enero de 1991, un mes después de la fecha originalmente pautada para ella. Para la celebración de esta vista, la representación legal del apelante tuvo que aprestarse y continuar así su preparación para el juicio. Éste se realizó luego de varias solicitudes de suspensión presentadas por la propia defensa, precisamente para disfrutar de más tiempo para preparar su caso.[9] El 11 de marzo de 1991 dio inicio el proceso de desinsacular al Jurado y el 14 de marzo comenzó a declarar la primer testigo.

Un examen de autos y de la exposición narrativa de la prueba revela que el apelante tuvo una representación legal adecuada y efectiva. Su abogada interrogó a los señores del Jurado, formuló las recusaciones, tomó parte activa durante el proceso y efectuó con diligencia los contrainterrogatorios. Incluso presentó dos testigos con el propósito de establecer una duda razonable sobre la participación de su representado en los hechos imputados. Por lo tanto, este error no fue cometido.

IV

Como segundo señalamiento de error se alega que la identificación que hizo la víctima, mediante el procedi-

---

[9] Surge de los autos que acompañan el recurso de apelación, que el foro a quo suspendió en dos ocasiones la vista del juicio a solicitud de la defensa para que ésta se pudiese preparar y para que pudiera entrevistar a unos testigos. Véanse: Minuta de 1ro de marzo de 1991 y Minuta de 7 de marzo de 1991.

miento de rueda de detenidos, estuvo viciada y que por ello el foro a quo erró al no suprimirla.

Para determinar la validez de la identificación de un sospechoso deben dilucidarse dos cuestiones principales, a saber: (1) si dicha identificación ha sido confiable, y (2) si en el curso de ésta no hubo irregularidades los que afectasen irremediablemente los derechos sustanciales del acusado. *Pueblo v. Rodríguez Román*, 128 D.P.R. 121 (1991); *Pueblo v. Peterson Pietersz*, 107 D.P.R. 172 (1978); *Pueblo v. Montañez Ramos*, 100 D.P.R. 911 (1972); *Pueblo v. Gómez Incera*, 97 D.P.R. 249 (1969). Reiteradamente hemos señalado que la validez de una identificación depende de la totalidad de las circunstancias que rodean al proceso de identificación. *Pueblo v. Torres Ramos*, 121 D.P.R. 747 (1988); *Pueblo v. Rodríguez Maysonet*, 119 D.P.R. 302 (1987); *Pueblo v. Rosso Vázquez*, 105 D.P.R. 905 (1977); *Pueblo v. Toledo Barbosa*, 105 D.P.R. 290 (1976); *Pueblo v. Figueroa Torres*, 102 D.P.R. 76 (1974). Hemos señalado como factores principales que se deben evaluar para determinar la confiabilidad de la identificación: "la oportunidad que tuvo el testigo de observar al ofensor al tiempo en que cometía el crimen, el grado de atención del testigo, la corrección de la descripción previa del criminal por el testigo, el nivel de certeza demostrado por el testigo en la confrontación, y el tiempo transcurrido entre el crimen y la confrontación". *Pueblo v. Peterson Pietersz*, supra, pág. 183.

También hemos señalado que "[l]o importante no es el método utilizado en la identificación, sino que la misma sea libre, espontánea y confiable". *Pueblo v. Ramos y Álvarez*, 122 D.P.R. 287, 312 (1988). En consecuencia, hemos aprobado el uso de varios métodos para la identificación de sospechosos. *Pueblo v. Ramos y Álvarez*, supra. Incluso hemos aceptado la validez de la identificación de un acusado *realizada en el acto del juicio*, y ello aun cuando la identificación previa efectuada durante la etapa ivestigativa re-

sultare inadmisible, claro está, siempre y cuando esa identificación posterior no dependa ni sea el producto de sugestividad que hubiese viciado la identificación. *Pueblo v. Rey Marrero*, 109 D.P.R. 739 (1980); *United States v. Crews*, 445 U.S. 463 (1980).

Veamos si al aplicar estos principios a los hechos específicos del presente caso, la identificación del apelante fue confiable o si estuvo viciada a tal extremo que afectara los derechos del acusado. El apelante plantea que su identificación fue sugestiva y que no cumple con los criterios de confiabilidad para relacionarlo con los delitos imputádosle. Alega que, durante la celebración de la rueda de detenidos, se le indicó a los integrantes de la rueda que dijeran su nombre y ello le perjudicó, ya que en ese momento la víctima conocía su nombre y su presunta participación en los hechos delictivos objeto de investigación. La prueba desfilada sobre este particular fue contradictoria. Por un lado, la víctima y la agente Quiñones negaron que se le hubiese requerido a los miembros de la rueda decir sus nombres. Por otro lado, los testigos presentados por la defensa[10] señalaron que los miembros de la rueda sí dijeron sus nombres. Habiendo determinado el tribunal que la rueda de detenidos no estuvo viciada,[11] le correspondía al Jurado adjudicar la credibilidad que estos testigos le merecieran y así lo hizo, contra el acusado. Reiteradamente hemos señalado que no intervendremos con la apreciación y adjudicación de credibilidad que de la prueba testifical hizo el Jurado, a menos que un examen sereno, detallado y desapasionado de la prueba produzca en nuestro ánimo insatisfacción o intranquilidad de conciencia. *Pueblo v. Men-*

---

[10] Dichos testigos eran Víctor Dipiní, Investigador de la Sociedad para Asistencia Legal, Jorge A. De Jesús Dávila, paciente del Hogar Crea, y José A. Torres Rodríguez, padre del acusado.

[11] Surge del expediente que, luego de comenzado el juicio, el tribunal, en ausencia del Jurado, celebró una vista evidenciaria para discutir una moción de supresión de identificación presentada por la representación legal del acusado. Habiendo escuchado la prueba presentada por la defensa, el tribunal declaró no ha lugar a la moción aludida por entender que la identificación no había estado viciada.

*doza Lozada*, 120 D.P.R. 815 (1988); *Pueblo v. Acabá
Raíces*, 118 D.P.R. 369 (1987); *Pueblo v. Cabán Torres*, 117
D.P.R. 645 (1986); *Pueblo v. Millán Meléndez*, 110 D.P.R.
171 (1980).

Alega el apelante, además, que la víctima no pudo espe-
cificar en qué momento vio las caras de los individuos que
la atacaron y que en el lugar de los hechos no había sufi-
ciente iluminación para observarlos. No tiene razón. El
testimonio creído por el Jurado señala que la víctima de-
claró que pudo observar la cara de sus agresores desde el
momento cuando la obligaron a subir a su automóvil, ya
que tuvo al acusado muy cerca de ella y en ese momento
éste ya no llevaba puesta la camiseta sobre la cara. Ade-
más, tuvo la oportunidad de observarlos durante el tra-
yecto al lugar donde ocurrieron los hechos delictivos.
Luego, la naturaleza y duración de los ataques sexuales
sufridos por la víctima en el manglar cerca de la Base Mu-
ñiz y demás incidentes ocurridos allí, requirieron un grado
razonable de atención de la testigo, que le permitió obser-
var a sus agresores detenidamente. En cuanto al lapso de
tiempo transcurrido entre los hechos y la celebración de la
rueda de detenidos, éste fue de un mes, que no es un lapso
tan largo como para olvidar el semblante del ofensor. En
cuanto a la descripción que hizo la víctima del acusado, la
discrepancia fundamental entre el Ministerio Público y la
defensa gira en torno a la edad del acusado. La víctima, al
describir a los acusados a la Policía, señaló —en cuanto a
este particular— que uno de ellos parecía de 23 años, otro
de 22 y al tercero no lo pudo identificar. Por su parte, la
defensa alega que el acusado es un menor, de 17 años de
edad, que aparenta ser más joven y que luce como un niño,
y no como un joven de 22 ó 23. Independientemente de que
el acusado no luzca como un joven de 22 ó 23 años, la rea-
lidad es que tampoco podemos concluir que fácilmente se
confunda con un niño. Aunque es cierto que la víctima en
su descripción inicial al agente Pagán el día de los hechos

señaló que dos de sus agresores parecían de 22 ó 23 años de edad, luego, durante el proceso de investigación, ésta le informó a la agente Quiñones que uno de sus agresores parecía menor. Esta discrepancia por sí sola no vicia la identificación del acusado de tal forma que la haga no confiable. Véase *Pueblo v. Márquez y Bermúdez*, 122 D.P.R. 93 (1988). El apelante no hace referencia al resto de la descripción hecha por la víctima, por lo que presumimos que estuvo correcta. Nuevamente señalamos que cualquier conflicto a este respecto correspondía dirimirlo al Jurado, lo que hizo, contra el apelante. En ausencia de circunstancias extraordinarias no alteraremos el valor, la credibilidad y la determinación que el Jurado le otorgó a la prueba. *Pueblo v. Acabá Raíces*, supra; *Pueblo v. Cabán Torres*, supra; *Pueblo v. Torres Ramos*, supra.

## V

Como tercer error se alega que no se probó la relación del acusado con los delitos imputados más allá de duda razonable, por la alegada falta de confiabilidad de la identificación y el testimonio exculpatorio presentado por la defensa. Respecto a la falta de confiabilidad en la identificación del acusado, ya hemos dispuesto de este señalamiento previamente, por lo que no tenemos nada más que añadir al respecto. En cuanto al testimonio exculpatorio alegado, debemos señalar que éste provenía de testigos que el Jurado tuvo ante sí y al cual no adjudicó credibilidad alguna. Sobre este asunto de apreciación de la prueba, reiteradamente hemos resuelto que concedemos gran deferencia a las determinaciones de hecho efectuadas por los tribunales de instancia. *Pueblo v. Echevarría Rodríguez I*, 128 D.P.R. 299 (1991); *Pueblo v. Falcón Negrón*, 126 D.P.R. 75 (1990); *Pueblo v. Rodríguez Román*, supra. Más aún, cuando el planteamiento de insuficiencia de prueba se re-

duce a uno de credibilidad de los testigos. *Pueblo v. Hernández Mercado*, 126 D.P.R. 427 (1990).

Ante tales planteamientos, en ausencia de error, prejuicio o parcialidad, no intervendremos con la apreciación de la prueba ni con el veredicto condenatorio del Jurado, quien está en mejor posición de aquilatar testigos, elementos éstos con los que no cuenta un tribunal apelativo y frente a los cuales debemos reconocer la posición inigualable en la que se halla el tribunal de instancia. *Pueblo v. Sánchez Molina*, 134 D.P.R. 577 (1993); *Pueblo v. De León Martínez*, 132 D.P.R. 746 (1993); *Pueblo v. Flores Betancourt*, 124 D.P.R. 867 (1989); *Pueblo v. Reyes Morán*, 123 D.P.R. 786 (1989).

## VI

Como último error, alega el apelante que erró el foro a quo al negarle al acusado los beneficios de una sentencia suspendida y al imponerle penas con agravantes, a pesar de ser primer ofensor y menor de edad. No tiene razón.

La sentencia impuesta al apelante fue la establecida por el legislador para estos delitos, cuando están presentes circunstancias agravantes. Dicha sentencia fue impuesta luego de que el Ministerio Público presentara una moción de agravantes que se apoyaban en la prueba desfilada.

Surge de dicha moción, así como de la prueba desfilada, que los delitos por los cuales fue encontrado culpable el apelante son de naturaleza violenta y que causaron grave daño corporal a la víctima. Los hechos revelan una gran crueldad de su parte, carencia de respeto por la vida y la dignidad humana, así como un total rechazo de las normas básicas de decencia. El apelante, en unión a dos individuos, con un arma de fuego en mano, sustrajo de su hogar a la víctima y la llevó a un lugar apartado donde la obligó a sostener todo tipo de relación sexual. Esto, según surge de la prueba, se llevó a cabo de la forma más despiadada y

642

brutal posible. El apelante asumió una posición de líder, a los fines de satisfacer sus más bajos instintos. Además, debe destacarse su burla ante los reclamos de piedad de la víctima, reclamos que fueron rechazados mediante palabras soeces, indicativas de una ausencia total de calidad humana.

La posición de líder del apelante puede apreciarse desde el comienzo de la acción delictiva, cuando fue él quien le requirió a la víctima que pusiera el vehículo en marcha y luego cuando inició el ataque sexual contra ésta. Ante estos hechos, no erró el tribunal al imponer las penas con agravantes.[12] Por la misma razón, tampoco abusó de la discreción que el ordenamiento jurídico le otorga para imponer las penas de manera consecutiva. *Pueblo v. Hernández Mercado*, supra; *Pueblo v. González*, 97 D.P.R. 541 (1969).

■ En cuanto a la denegatoria de suspender la sentencia, reiteradamente hemos señalado que la concesión del beneficio de sentencia suspendida es discrecional. *Vázquez v. Caraballo*, 114 D.P.R. 272 (1983); *Pueblo v. Álvarez Maurás*, 100 D.P.R. 620 (1972); *Pueblo v. Martínez Rivera*, 99 D.P.R. 568 (1971); *Pueblo v. Pérez Bernard*, 99 D.P.R. 834 (1971); *Pueblo v. Llanos Virella*, 97 D.P.R. 95 (1969). El disfrute de una sentencia suspendida es un privilegio, no

---

[12] Los hechos de este caso, según probados, se ajustan a los subincisos (a), (b) y (e) de la Regla 171 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, los cuales disponen:

"Se podrán considerar como circunstancias agravantes, entre otras, las siguientes:

"(A) Hechos relacionados con la comisión del delito y con la persona del acusado, incluyendo entre otros:

"(a) El delito fue de violencia, se causó grave daño corporal, o amenaza de causarlo y se evidenciaron hechos que revelan una gran crueldad, ningún respeto humano y un rechazo a las normas de la decencia;

"(b) el acusado utilizó un arma en la comisión del delito;

. . . . .

"(e) el acusado indujo a otros a participar en la comisión del delito u ocupó una posición de líder o dominante entre los demás participantes ...."

un derecho. *Pueblo v. Álvarez Maurás*, supra; *Pueblo v. Martínez Rivera*, supra; *Pueblo v. Rivera*, 79 D.P.R. 880 (1957). En vista de ello, la denegatoria de una sentencia suspendida cae dentro de la discreción de un tribunal. Tiene dicha denegatoria la presunción de ser justa y correcta. *Pueblo v. Pérez Bernard*, supra; *Pueblo v. Acosta Torres*, 92 D.P.R. 887 (1965); *Pueblo v. Feliciano*, 67 D.P.R. 247 (1947). La ausencia de antecedentes penales no es por sí una causa suficiente para que un convicto obtenga la libertad a prueba. *Pueblo v. Pérez Bernard*, supra; *Pueblo v. Luciano*, 77 D.P.R. 597 (1954).

Por los fundamentos que anteceden, *se confirma la sentencia dictada por el Tribunal Superior, Sala de Carolina, el 31 de mayo de 1991.*