ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO APELADO V. OMAR OSVALDO RUIZ FIGUEROA APELANTE | KLAN202500123 | Apelación procedente del Tribunal de Primera Instancia, Sala de Superior de Caguas Caso Número: E VI2023G0019 E LA2023G0074 Sobre: Art. 95 CP (Asesinato atenuado); Art. 6.14 Ley de Armas |
|---|---|---|

Panel integrado por su presidente, el Juez Salgado Schwarz, el Juez Monge Gómez y la Juez Lotti Rodríguez.[1]

Lotti Rodríguez, Juez Ponente

### SENTENCIA

En San Juan, Puerto Rico a 12 de febrero de 2026.

El señor Omar Osvaldo Ruiz Figueroa (en adelante, señor Ruiz Figueroa o apelante) mediante recurso de *Apelación* presentado el 11 de noviembre de 2025, nos solicita que dejemos sin efecto la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala de Caguas (en adelante, TPI o foro primario) el 16 de enero de 2025. Mediante ese dictamen, el foro primario impuso una pena de reclusión de quince (15) años por Artículo 95 del Código Penal 2012, 33 LPRA sec. 5144, a ser cumplidos de manera consecutiva con diez (10) años de reclusión por el Artículo 6.14 de la Ley Núm. 168-2019, *infra*. El total de la sentencia impuesta en el caso de autos asciende a veinticinco (25) años de reclusión.

Por los fundamentos que proceden a continuación, se **confirma** la *Sentencia* apelada.

---

[1] Conforme la OATA-2025-065 del 6 de mayo de 2025, mediante la cual se asignó a la Juez Glorianne M. Lotti Rodríguez en sustitución del Hon. Félix R. Figueroa Cabán.

**I.**

Por hechos ocurridos el 20 de abril de 2023, en el municipio de Caguas, el Ministerio Público presentó dos (2) acusaciones contra el señor Ruiz Figueroa por los siguientes delitos: asesinato en primer grado, y por disparar o apuntar armas de fuego. En síntesis, al señor Ruiz Figueroa se le acusó de asesinar el Sr. Eggy A. Galarza Estrada (en adelante, Eggy) mediante varios disparos con un arma de fuego. Superados los trámites de rigor, el juicio en su fondo se celebró ante un Jurado en los días 30 de julio de 2024, 4, 5, 6, 9, 10, 11, 12 y 17 de septiembre de 2024 y 16 de enero de 2025.

Durante el juicio, el Ministerio Público presentó los siguientes testigos: la Sra. Laraiza Marie Rivera Ayala; la Sra. Karilin Ayala Ortiz; la Sra. Angie Estrada Flores; el Agte. Tito O. Rivera Hernández; la Agte. Lorna M. Padilla Cartagena; el Dr. Francisco J. Dávila Toro; el Sr. Jesús M. Torres Ramírez; la Agte. Lisandra Aponte Rodríguez; el Agte. Jean M. Velázquez Claudio, y el Agte. Carlos J. del Valle Arroyo.

Los testimonios y la prueba de cargo presentada en el juicio, la resumimos a continuación:

1. **Sra. Laraiza Marie Rivera Ayala (en adelante, señora Rivera Ayala)**

La señora Rivera Ayala fue la investigadora forense que intervino en los hechos del presente caso.[2] Al llegar a la escena del crimen esta la describe como un área rural ("área verde, zona boscosa").[3] Como parte de sus labores en la escena, la testigo utilizó la tecnología del equipo FARO, descrito como un escáner que se coloca en un trípode, y que tiene la capacidad de capturar la escena a 360 grados.[4] Indicó que FARO realizó un video de toda la escena.

---

[2] Transcripción de Prueba Oral (TPO) (4 de septiembre de 2024), pág. 18, líneas 1-8.
[3] TPO (4 de septiembre de 2024), pág. 24, líneas 2-10.
[4] TPO (4 de septiembre de 2024), págs. 20-21.

Mediante ese video proyectado en corte, esta describió el espacio de la escena como la residencia del señor Omar, la carretera, el vehículo del occiso.[5] Un área verde y una residencia en concreto la que estaba abandonada.[6] Al final observó un camión abandonado.[7]

Especificó que las piezas de evidencia consistían en once (11) casquillos y un vehículo Toyota Tercel de color gris.[8] Indicó que observó el vehículo en la parte frontal, el cual no tenía perforaciones ni impacto de bala. Según la ubicación, se estableció que la persona que disparó estaba parada del lado del pasajero.[9] Dentro del vehículo, al lado del conductor en la silla de pasajero, se localizó lo que vendría siendo una cartera o un bulto negro.[10] En el interior de éste tenía celulares, documentos personales, los *plugs* de los cargadores, llaves, licencias, tarjetas de presentación y un arma.[11] Mencionó que el revólver estaba cargado.[12] La testigo aclaró que el bulto se encontraba con el *zipper* cerrado cuando llegó a la escena.[13] Además, indicó que había un machete mohoso entre el asiento, el piso y lo que viene siendo parte del panel de instrumentos, donde está la palanca de cambios, la gaveta.[14] El machete quedaba a la derecha del occiso.[15]

En el contrainterrogatorio, admitió que, en la escena, vio un letrero que decía "Propiedad privada. No pasar.", pero que esto no le llamó la atención.[16] Declaró que no relacionó el letrero ni el camión con la evidencia del lugar.[17] Indicó que el vehículo Toyota Tercel no

---

[5] TPO (4 de septiembre de 2024), pág. 24, líneas 2-10.
[6] Íd.
[7] Íd., págs. 11-14.
[8] TPO (4 de septiembre de 2024), pág. 27, líneas 2-10.
[9] TPO (4 de septiembre de 2024), págs. 32-33.
[10] TPO (4 de septiembre de 2024), pág. 36.
[11] Íd.
[12] TPO (4 de septiembre de 2024), pág. 38, líneas 19-21.
[13] Íd., líneas 20-24.
[14] TPO (4 de septiembre de 2024), pág. 37., líneas 3-13
[15] Íd., línea 15.
[16] TPO (5 de septiembre de 2024), pág. 49., líneas 14-24.
[17] Íd., págs. 27-30.

se encontraba estacionado en una propiedad privada.[18] Insistió en que el bulto donde se encontraba el arma estaba cerrado.[19] Además, admitió que en el baúl del vehículo se encontró una anilla de goma y otro machete.[20] De igual forma, reconoció que dicha escena estaba en un lugar retirado, sin más casa que la del acusado.[21]

### 2. Sra. Karilin Ayala Ortiz (en adelante, señora Ayala Ortiz)

En el directo, relató que, para el 20 de abril de 2023, residía con el apelante —su pareja— en el Sector Las Carmelitas del Barrio San Antonio de Caguas.[22] Declaró que, en esa fecha, se encontraba trabajando y recibió una llamada del señor Ruiz Figueroa, quien le instruyó a que acudiera al cuartel más cercano y solicitara que una patrulla la llevara hasta su casa.[23] Llegó al cuartel localizado cerca del Centro de Bellas Artes de Caguas, donde conversó con un agente "calvito" y le dijo que el señor Ruiz Figueroa se había defendido, por lo que ella necesitaba que una patrulla la escoltara a su hogar.[24] El agente le cuestionó a qué se refería con haberse defendido, a lo cual respondió que desconocía lo que sucedió.[25] Declaró que no le proveyó el número de teléfono del señor Ruiz Figueroa al agente "calvito".[26]

Seguidamente, le explicó a la agente de cabello corto que el señor Ruiz Figueroa la llamó para notificarle que se defendió, así como también le indicó que este contaba con licencia para portar armas.[27] Declaró que llamó al apelante desde el cuartel, y que este le informó que había una persona muerta.[28] En el contrainterrogatorio, declaró que las armas del señor Ruiz Figueroa

---

[18] TPO (5 de septiembre de 2024), págs. 50-51, líneas 10-4.
[19] TPO (5 de septiembre de 2024), pág. 52.
[20] TPO (5 de septiembre de 2024), págs. 57-58.
[21] TPO (5 de septiembre de 2024), págs. 58-59.
[22] TPO (5 de septiembre de 2024), pág. 62.
[23] TPO (5 de septiembre de 2024), págs. 62-63.
[24] TPO (5 de septiembre de 2024), pág. 65.
[25] Íd.
[26] Íd.
[27] TPO (5 de septiembre de 2024), pág. 67.
[28] TPO (5 de septiembre de 2024), pág. 68.

eran legales, e indicó que este cuenta con licencia de armas.[29] Testificó que residen en una zona boscosa y solitaria.[30] En su declaración jurada, hizo constar que vio un vehículo "subiendo y bajando" por su casa, quien resultó ser Eggy.[31] Cuando esta llegó a la escena, el señor Ruiz Figueroa le manifestó que se defendió y se entregó voluntariamente a las autoridades.[32]

### 3. Sra. Angie Estrada Flores ("señora Estrada Flores")

En el directo, declaró que conoce al apelante desde hace muchos años, e indicó que mantenía comunicación con los padres de este.[33] Luego de identificar al señor Ruiz Figueroa en corte abierta, testificó que, para el 20 de abril de 2023, este residía en el Sector Las Carmelitas; un hecho que la testigo conocía porque realizó la compraventa de esa propiedad.[34] Añadió que conocía a Eggy porque era su sobrino y, además, manifestó que se encargó de la compraventa de su propiedad.[35] Relató que fue la primera persona de la familia a quien le notificaron acerca de la muerte de Eggy.[36] Expresó que el cadáver estaba en el interior de un Toyota blanco, el cual se encontraba estacionado al lado de una residencia vacía.[37] Relató que, en la escena, había un camión abandonado, perteneciente al Sr. Jerry Ramos.[38] Afirmó que la casa del señor Ruiz Figueroa estaba mucho más arriba del lugar donde ocurrió el suceso.[39] Atestó que el vehículo de Eggy no estaba dentro de la casa del apelante.[40] Aseguró que la casa del señor Ruiz Figueroa queda bastante lejos.[41] En el contrainterrogatorio, reconoció que participó

---

[29] TPO (5 de septiembre de 2024), pág. 81.
[30] Íd.
[31] TPO (5 de septiembre de 2024), pág. 82.
[32] TPO (5 de septiembre de 2024), págs. 83-84.
[33] TPO (5 de septiembre de 2024), pág. 86.
[34] TPO (5 de septiembre de 2024), pág. 87.
[35] Íd.
[36] Íd.
[37] TPO (5 de septiembre de 2024), pág. 88.
[38] Íd.
[39] TPO (5 de septiembre de 2024), pág. 89.
[40] TPO (5 de septiembre de 2024), pág. 90.
[41] Íd.

en unas compraventas hace veintitrés (23) años, aunque desconoce lo que ha ocurrido en esas fincas.[42]

### 4. Agte. Tito O. Rivera Hernández ("agente Rivera Hernández")

En el directo, declaró que labora como agente de la Policía de Puerto Rico desde hace diez (10) años, y que está adscrito al Distrito de Caguas.[43] Testificó que, para el 20 de abril de 2023, trabajó desde las 4:00 a.m. hasta las 12:00 p.m. como retén de distrito, donde se encarga de orientar a la ciudadanía y atender las necesidades que surjan.[44] Indicó que, a eso de las 11:30 a.m., llegó la señora Ayala Ortiz —a quien identificó en sala— al cuartel y le expresó que necesitaba un policía para que la escoltara a su casa.[45] La señora Ayala Ortiz le informó que su esposo la llamó para decirle que tuvo que defenderse, y que había una persona muerta en el lugar.[46] Relató que le pidió el número de teléfono del señor Ruiz Figueroa para llamarlo cuando se estuviera dirigiendo al lugar de los hechos, pero la señora Ayala Ortiz se rehusó a proveerlo.[47]

Una vez llega a la escena junto a la sargento Padilla Cartagena, vio que el occiso estaba en el interior de un Toyota Tercel, y que este reflejaba diferentes impactos de bala en su cuerpo.[48] Manifestó que había una cartera o bulto negro en el asiento frontal del pasajero, el cual estaba cerrado.[49] También, mencionó que había un machete entre el sillón del chofer y la consola del vehículo.[50]

En el contrainterrogatorio, reconoció que el apelante se mantuvo cooperador durante la intervención. Declaró que había un machete al lado del derecho del occiso, ubicado entre la consola del

---

[42] TPO (5 de septiembre de 2024), pág. 93.
[43] TPO (6 de septiembre de 2024), pág. 99.
[44] TPO (6 de septiembre de 2024), pág. 101.
[45] TPO (6 de septiembre de 2024), pág. 102.
[46] TPO (6 de septiembre de 2024), pág. 103.
[47] TPO (6 de septiembre de 2024), pág. 104.
[48] TPO (6 de septiembre de 2024), pág. 120.
[49] TPO (6 de septiembre de 2024), pág. 121.
[50] Íd.

vehículo y el asiento del pasajero.[51] Reconoció que, al momento de su arresto, el señor Ruiz Figueroa tenía una escritura y unos planos. Atestó que, previo a la muerte de Eggy, ocurrió una "situación" en el lugar. En el redirecto, declaró que el 20 de abril de 2023 no recibió ninguna querella sobre amenazas ocurridas en el Barrio Carmelitas, Sector San Antonio.[52]

**5. Sgto. Lorna M. Padilla Cartagena ("agente Padilla Cartagena")**

En el directo, declaró que labora para la Policía de Puerto Rico desde hace 31 años, y que ha pertenecido a múltiples divisiones a través de este tiempo.[53] La señora Ayala Ortiz le indicó que el apelante la llamó para decirle que mató a alguien y solicitó que la acompañaran hasta su residencia.[54] Una vez el agente Rivera Hernández le confirma a la testigo que el apelante tiene armas registradas bajo su nombre y que cuentan con una fotografía de él, estos se dirigen al lugar de los hechos y allí ven al señor Ruiz Figueroa, ubicado cerca de un terraplén.[55] Al acercarse al señor Ruiz Figueroa, esta se percató de que este estaba armado, por lo que le solicitó que colocara al suelo las tres armas de fuego que traía consigo.[56]

Seguidamente, le leyó las advertencias de ley al ponerlo bajo arresto, ya que era sospechoso de asesinar a una persona, según le anunció la señora Ayala Ortiz cuando acudió al cuartel.[57] El señor Ruiz Figueroa le expresa que había matado a una persona en el lugar por problemas que ya tenían previos a ellos.[58] Al acercarse al vehículo Toyota, observó al occiso en el interior, e indicó que había

---

[51] TPO (6 de septiembre de 2024), pág. 129.
[52] TPO (6 de septiembre de 2024), págs. 135-136.
[53] TPO (6 de septiembre de 2024), pág. 137.
[54] TPO (6 de septiembre de 2024), pág. 141.
[55] TPO (6 de septiembre de 2024), págs. 141-142.
[56] TPO (6 de septiembre de 2024), pág. 144.
[57] TPO (6 de septiembre de 2024), pág. 148.
[58] TPO (6 de septiembre de 2024), pág. 149.

un machete entre el asiento del pasajero y la consola, al igual que vio una cartera deportiva cerrada en el asiento del pasajero.[59] Expresó que las llaves del vehículo estaban en el encendido, y que el cuerpo del occiso estaba en el asiento del conductor.[60] Afirmó que no vio armas de fuego en el interior del Toyota Tercel y resaltó que el machete no estaba expuesto.[61] Al cuestionársele sobre las armas que se ocuparon en la residencia del apelante, declaró que estas no guardaban relación con la escena, ya que el señor Ruiz Figueroa tenía tres armas consigo en el lugar de los hechos.[62]

En el contrainterrogatorio, reconoció que las armas de fuego pueden utilizarse para la defensa personal, la protección de la propiedad y el cuidado de la familia.[63] Aceptó que las armas se usan para defenderse afirmativamente frente a un peligro inminente.[64] Reconoció que el apelante se mantuvo cooperador, tranquilo y responsivo durante el arresto.[65] Declaró que el señor Ruiz Figueroa le dijo que tuvo una discusión por un asunto de colindancias, así como también le dijo que vio a Eggy sacando unas piezas del camión abandonado. Admitió que el apelante le manifestó que Eggy le dijo: "vengo ahora. Ya verás lo que te va a pasar, te voy a explotar.[66]

### 6. Dr. Francisco J. Dávila Toro ("doctor Dávila Toro")

En el directo, tras cualificarse como perito en patología forense, declaró que tiene una relación de servicios profesionales con el ICF.[67] Al mostrársele el Exhibit 12 —consistente en el Informe Médico Forense 1CF2023-02771, estipulado por la Defensa—, relató que el occiso era el señor Eggy Andrés Galarza Estrada, y que este

---

[59] Íd.
[60] TPO (6 de septiembre de 2024), pág. 150.
[61] TPO (6 de septiembre de 2024), pág. 155.
[62] TPO (6 de septiembre de 2024), págs. 158-159.
[63] TPO (9 de septiembre de 2024), pág. 173.
[64] Íd.
[65] TPO (9 de septiembre de 2024), pág. 174.
[66] TPO (9 de septiembre de 2024), pág. 176.
[67] TPO (9 de septiembre de 2024), pág. 182.

recibió once (11) heridas de bala.[68] Entre las heridas que recibió, tres (3) de estas fueron de entrada y sin salida, por lo que ocupó tres (3) proyectiles del cuerpo del occiso.[69] Explicó que el occiso tenía diez (10) heridas de bala en su lado derecho del cuerpo, mientras que tenía una (1) sola herida de bala en el lado izquierdo.[70] Luego de analizar las fotos de la escena, relató que los disparos se realizaron del modo siguiente:

> Si yo establezco que la distancia de disparo es más de tres pies, y por el vehículo que había, es un vehículo relativamente pequeño, el arma de fuego debe haber estado en las cercanías, pero fuera de ese vehículo de motor; probablemente en el lado derecho del vehículo de motor, porque la gran mayoría de las heridas de balas están en el lado derecho. **Así que, eso posiciona el arma de fuego al lado derecho de la víctima. Y con el restablecimiento de una distancia de disparo de más de tres pies, tiene que estar fuera del vehículo, el arma de fuego.**[71]

**7. Agte. Jesús M. Torres Ramírez ("agente Torres Ramirez")**

En el directo, declaró que labora para la División de Homicidios de Caguas desde el 2008.[72] Con respecto a los hechos de este caso, describió la escena del modo siguiente:

> Yo puedo observar que era un camino vecinal en cuesta. Cuando llego al lugar, nos estacionamos más abajo, para evitar la escena. Cuando observo la cuesta, puedo observar que, al lado derecho, había un camión en el área del pasto, abandonado. Más arriba, observo que había una casa, también abandonada. Al frente de la casa, exactamente en la carretera, veo un vehículo Toyota Tercel viejito, color gris, que está en dirección hacia la salida, ya que era una cuesta, O sea, que venía bajando y está parado allí. Comienzo a caminar, observó que había personas más arriba en un terraplén. Veo a mis compañeros de la Policía, comenzamos a caminar. Y cuando estamos llegando al Tercel, me puedo percatar que, en el área del pavimento, en la carretera, había múltiples casquillos de bala disparados.[73]

---

[68] TPO (9 de septiembre de 2024), págs. 186-187.
[69] TPO (9 de septiembre de 2024), pág. 187.
[70] TPO (9 de septiembre de 2024), pág. 191.
[71] TPO (9 de septiembre de 2024), pág. 192, líneas 3-9.
[72] TPO (9 de septiembre de 2024), pág. 200.
[73] TPO (9 de septiembre de 2024), págs. 200-201.

Manifestó que el cadáver de Eggy estaba sentado en el asiento del conductor del Tercel, el cual permanecía encendido. Luego de ofrecerle las advertencias de rigor y orientar al apelante sobre su derecho a estar asistido de un abogado, declaró que el señor Ruiz Figueroa le relató cómo ocurrieron los hechos donde este asesinó a Eggy:

> Él estaba cuidando dos de sus hijos, dos niños; uno de 13 y uno de 15 años, porque su mamá estaba trabajando, y él tenía que cuidarlos ese día. Que él escucha desde su residencia que están cortando pasto con un machete, que él sale de su residencia, baja hasta la marquesina y observa que hay una persona cerca del camión, que está sacando unas piezas y colocándolas de frente... Okey. Posteriormente él observa eso, él se percata de que él vehículo que estaba allí estacionado era un Toyota Tercel gris, viejito. Él identifica ese vehículo como que era Eggy la persona que estaba allí, que él me menciona que Eggy era el dueño anterior de esa finca, que posteriormente él lo ve sacando piezas de ese camión. Él decide subir a su casa y buscó una pistola Taurus, 9 milímetros y se la colocó en el bolsillo izquierdo delantero. Posteriormente observa eso, baja nuevamente hacia donde estaba el vehículo Toyota Tercel, y allí él comienza a dialogar con... a interactuar con el señor Eggy. Aproximadamente le habla de unos 30 pies, que estaba... ya él venía del camión —Eggy, hablando de Eggy— venía del camión hacia el Tercel, caminando, y comienzan a interactuar. Y comienzan a conversar de que Omar está manifestándole y reclamándole que esas piezas de ese camión no eran ni de él, que ese camión no era ni de él ni de Eggy, y que devolviera las piezas que había sacado del carro. **En ese momento, Eggy está caminando hacia el carro y él entiende que él iba a sacar las piezas del carro para devolverlas, y Eggy lo que hizo fue que se monta en el vehículo, lo enciende y baja el cristal del pasajero por dentro del vehículo. Cuando le manifiesta eso, antes de eso, de él montarse, él le dice: "Tú no sabes en el problema que tú te estás metiendo". Le baja el cristal por dentro y le dice: "No te preocupes, que yo vengo ahora. Yo vengo con más gente y vamos a resolver este problema". Y me indicó Omar que, rápidamente, él saca la pistola, por lo que le había mencionado, y desde la parte de afuera del carro, por el lado del pasajero le vació, pues, le disparó.[74]**

En el recontrainterrogatorio, reiteró que su rol consistió en entrevistar al apelante y compartir sus hallazgos con las compañeras que realizaron la investigación.

---

[74] TPO (9 de septiembre de 2024), págs. 206-212.

**8. Agte. Lisandra Aponte Rodríguez ("agente Aponte Rodríguez")**

En el directo, declaró que labora para la División de Homicidios del CIC de Caguas desde hace veinte (20) años.[75] Relató que, cuando llegó a la escena del delito, vio al señor Ruiz Figueroa arrestado, a quien identificó en sala.[76] Luego de conversar con la sargento Padilla Cartagena sobre los pormenores de lo sucedido, relató que el occiso —cuyo cadáver se encontraba en el interior de un vehículo— presentaba múltiples heridas de bala en el pecho, los hombros y en los brazos.[77] Manifestó que había un machete bien hundido al lado del asiento del conductor, e indicó que vio un bulto de color negro cerrado en el asiento del pasajero.[78] Explicó que se le tomaron fotos al bulto, y que, posteriormente, la investigadora Rivera Ayala lo abrió para verificar su interior.[79] Expresó que, en el interior del bulto, había un arma de fuego, descrita como un revólver de calibre .38 con seis balas.[80]

Relató que el Toyota Tercel fue ocupado y se transportó a la Comandancia de Humacao para que el personal de Análisis y Reconstrucción lo analizara.[81] Atestó que su interés consistía en conocer si el vehículo tenía proyectiles en su interior que fueran compatibles con los que disparó el arma ocupada. Afirmó que se ocuparon varios proyectiles del vehículo.[82] **Aseguró que no encontraron piezas de camión en el interior de vehículo, y que tampoco hallaron herramientas para "mecanear".**[83]

Como parte del interrogatorio directo, el Ministerio Público se refirió a las Advertencias de Ley —Exhibit 9 estipulado por las partes

---

[75] TPO (10 de septiembre de 2024), págs. 225-226.
[76] TPO (10 de septiembre de 2024), págs. 229-230.
[77] TPO (10 de septiembre de 2024), pág. 233.
[78] TPO (10 de septiembre de 2024), págs. 233-234.
[79] TPO (10 de septiembre de 2024), pág. 235.
[80] Íd.
[81] TPO (10 de septiembre de 2024), pág. 236.
[82] TPO (10 de septiembre de 2024), pág. 238.
[83] TPO (10 de septiembre de 2024), pág. 239.

y firmado por el apelante— y aludió a las admisiones que hizo el señor Ruiz Figueroa, las cuales el agente Torres Ramírez recogió en sus notas.[84] En referencia al documento, atestó que el apelante le manifestó a las autoridades que escuchó una especie de ruido, como si estuviesen bregando con un machete, y que al asomarse por su ventana, vio a Eggy en un Tercel viejito.[85] El señor Ruiz Figueroa admitió que, tras ver a Eggy, fue a buscar su pistola Taurus.[86] La testigo declaró que el apelante —ya armado— acudió hacia Eggy para reclamarle sobre unas piezas del camión abandonado.[87]

Seguidamente, y según las admisiones, el apelante le pidió a Eggy que le devolviera las piezas del camión, pero este último —quien le ripostó ser el dueño del área donde ubicaba el camión— no se llevó ninguna pieza.[88] Entonces, surge de las admisiones que el apelante le solicitó a Eggy que se marchara del lugar, por lo que este se subió a su vehículo y lo encendió para irse.[89] La agente Aponte Rodríguez declaró que Eggy le manifestó al señor Ruiz Figueroa lo siguiente: "No te preocupes que yo viro para atrás y busco gente, que vamos a resolver el problema.[90] Entonces, le narró que, cuando Eggy le manifestó estas palabras, el señor Ruiz Figueroa sacó la pistola Taurus de su bolsillo y comenzó a dispararle todas las municiones que tenía el arma de fuego.[91]

Por último, al cuestionársele sobre el contenido de las admisiones, la agente Aponte Rodríguez indicó que el apelante nunca expresó que sintiera miedo, o que haya visto a Eggy con un arma de fuego, ni llamó a la policía para que el occiso no estuviera en el lugar.[92] En el contrainterrogatorio, reconoció que la señora

---

[84] TPO (10 de septiembre de 2024), pág. 240.
[85] TPO (10 de septiembre de 2024), pág. 244.
[86] Íd.
[87] TPO (10 de septiembre de 2024), págs. 244-245.
[88] TPO (10 de septiembre de 2024), pág. 245.
[89] TPO (10 de septiembre de 2024), pág. 247.
[90] Íd.
[91] Íd.
[92] TPO (10 de septiembre de 2024), pág. 249.

Ayala Ortiz le dijo que el apelante se defendió.[93] Admitió que, en una ocasión, hubo que removerle las armas de fuego a Eggy tras haberle realizado unas manifestaciones hostiles al señor Ruiz Figueroa.[94] Reconoció que Eggy contaba con cuatro convicciones por delitos graves en su récord criminal.[95] En el redirecto, explicó que los documentos que mostró la Defensa reflejan que el occiso cometió los cuatro (4) delitos hace más de treinta (30) años.[96]

### 9. Sra. Jean Marie Velázquez Claudio ("señora Velázquez Claudio")

En el directo, declaró que, labora como investigadora forense en el ICF. Atestó que se desempeña en las divisiones de Investigación de Escenas y Análisis y Reconstrucción del ICF. Tras exponer sus cualificaciones y adiestramientos, expresó que la agente Rodríguez Aponte le solicitó que analizara un Toyota Tercel color gris de 1994.[97] Como parte de sus funciones, indicó que el primer paso consiste en fotografiar el vehículo por todas partes, incluyendo la tablilla, sus alrededores y el interior del mismo.[98] Una vez se le toman las fotografías, esta procedió a examinar el vehículo para identificar sus perforaciones. Para hacer su trabajo, utiliza unos tarugos —descritos como unas "varillas de madera"— y los coloca a través de las perforaciones del vehículo para conocer la trayectoria de los proyectiles.

Aclaró que, si bien halló siete (7) perforaciones en la puerta, lo cierto es que solo utilizó tres tarugos, dado que los tarugos no se colocan en todas las perforaciones[99]. Señaló que esas tres perforaciones tenían salida. Atestó que halló seis (6) proyectiles en

[93] TPO (11 de septiembre de 2024), pág. 291.
[94] TPO (11 de septiembre de 2024), pág. 301-305.
[95] TPO (11 de septiembre de 2024), pág. 305.
[96] TPO (11 de septiembre de 2024), pág. 306.
[97] TPO (11 de septiembre de 2024), pág. 317.
[98] TPO (11 de septiembre de 2024), pág. 319.
[99] TPO (11 de septiembre de 2024), pág. 325.

la puerta del chofer y un proyectil adicional en la parte posterior del vehículo.[100] En el contrainterrogatorio, declaró que no vio una anilla de goma en el baúl del vehículo.[101] Aceptó que había picadura de una sustancia controlada en el interior del vehículo.[102]

### 10. Sr. Carlos J. del Valle Arroyo ("señor del Valle Arroyo")

En el directo, declaró que labora como examinador de armas de fuego en el ICF desde hace veintiséis (26) años: tres (3) de ellos como investigador forense y veintitrés (23) como balístico.[103] Al preguntársele cómo sabe que los casquillos ocupados en la escena se dispararon con la pistola Taurus perteneciente al apelante, este explicó que mediante examen microscópico se llevaron estos casquillos que están aquí, se pusieron en un microscopio.[104] Uno de ellos se utilizó como muestra representativa con el disparo de prueba de esta pistola. Se llevó a un microscopio de comparación y se determinó que esa pistola fue el arma de fuego utilizada para disparar estos once (11) casquillos.

En el contrainterrogatorio, reconoció que su participación en la investigación se limitó a temas periciales relacionados a los casquillos de bala. Declaró que desconoce el móvil de los hechos. Aceptó que se permite el uso de armas de fuego para defender la vida y la propiedad de los ciudadanos.[105] Admitió que desconocía si el arma de fuego se utilizó para defenderse.[106]

**Hasta aquí los testimonios presentados en el Juicio en su Fondo.**

Luego de aquilatar la totalidad de la prueba, el Jurado rindió un veredicto de culpabilidad por los delitos de apuntar un arma de

---

[100] Íd.
[101] TPO (11 de septiembre de 2024), pág. 333.
[102] TPO (11 de septiembre de 2024), pág. 334.
[103] TPO (12 de septiembre de 2024), pág. 337.
[104] TPO (12 de septiembre de 2024), pág. 340.
[105] TPO (12 de septiembre de 2024), pág. 364.
[106] Íd.

fuego y asesinato atenuado, siendo este último un delito menor incluido con respecto al asesinato en primer grado.

Así las cosas, el 16 de enero de 2025, el foro primario dictó una *Sentencia,* mediante la cual le impuso al señor Ruiz Figueroa las penas siguientes: quince (15) años de cárcel por el cargo de asesinato atenuado, y diez (10) años de cárcel por disparar un arma de fuego, incluyendo la duplicación de la pena. Asimismo, ordenó el cumplimiento consecutivo de ambas penas, e impuso al señor Ruiz Figueroa el pago de la pena especial, a razón de trescientos dólares por cada cargo.

Inconforme, el 14 de febrero de 2025 el señor Ruiz Figueroa recurrió a este Tribunal mediante un recurso de *Apelación.* Luego de que la transcripción de la prueba oral quedara estipulada, el apelante presentó su alegato suplementario el 11 de noviembre de 2025.

En su recurso de apelación, el señor Ruiz Figueroa señala los siguientes señalamientos de error:

> Erró el Tribunal de Primera Instancia al determinar que no daría una instrucción de legítima defensa al Jurado.

> Erró el Tribunal de Primera Instancia al emitir un fallo de culpabilidad y acoger el veredicto del Jurado, cuando la prueba presentada no estableció su culpabilidad más allá de duda razonable en cuanto a un asesinato atenuado.

Por su parte, El Pueblo de Puerto Rico, representado por la Oficina del Procurador General de Puerto Rico, mediante recurso de oposición a la apelación le solicita a este Tribunal que sostenga la corrección de la convicción, por razón de que el Ministerio Público probó con suficiencia constitucional la comisión de ambos delitos. Además, sostiene que hubiese sido improcedente impartirle al Jurado las instrucciones relativas a la legítima defensa, toda vez que no existe en el récord judicial prueba alguna que pueda justificar el ofrecimiento de estas instrucciones.

**II.**

**A. Deferencia judicial en la apreciación de la prueba**

Es norma reiterada que nuestro esquema probatorio está revestido por un manto de deferencia hacia las determinaciones de los juzgadores de primera instancia sobre la prueba testifical ante su consideración. *Pueblo v. De Jesús Mercado*, 188 DPR 467, 477-478 (2013) (Sentencia). Más aún cuando el planteamiento sobre la insuficiencia de la prueba se reduce a la credibilidad de los testigos, dado a que, existe un principio inquebrantable de que es el foro sentenciador el que se encuentra en mejor posición para hacer esa evaluación y adjudicación. *Pueblo* v. *Toro Martínez,* 200 DPR 834, 857 (2018); *Pueblo v. De Jesús Mercado, supra,* pág. 479; *Pueblo v. García Colón I,* 182 DPR 129 (2011); *Pueblo v. Torres Rivera,* 137 DPR 630, 640-641 (1994); *Pueblo v. Cabán Torres*, 117 DPR 645, 654 (1986).

El juez sentenciador, ante quien deponen los testigos, es quien tiene la oportunidad de verlos y observar su manera de declarar. Esto incluye, pero no se limita, a gestos, titubeos, contradicciones, manerismos, dudas, vacilaciones y, por consiguiente, de ir formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad. *Pueblo* v. *Toro Martínez, supra,* págs. 857-857; *Pueblo v. García Colón I, supra,* pág. 165. Ante ello, como regla general, un tribunal revisor está imposibilitado de intervenir con la adjudicación de credibilidad de los testigos. *Pueblo* v. *Toro Martínez, supra,* pág. 858; *Pueblo v. De Jesús Mercado, supra,* pág. 478; *Pueblo v. García Colón I, supra,* pág. 165; *Pueblo v. Cabán Torres, supra,* pág. 654. Es decir, al foro primario está en mejor posición, el foro apelativo no puede sustituir las determinaciones de hecho que este hizo, luego de escuchar, ponderar, valorar y determinar si cierto testimonio es

creíble. *Pueblo* v. *Toro Martínez, supra*. Por lo tanto, la revisión debe estar guiada por parámetros estrictos.

No obstante, foros apelativos sí intervendrán y descartarán la credibilidad que el juzgador adjudicó a los testigos, cuando este actuó movido por pasión, prejuicio parcialidad o incurrió en un error manifiesto en su adjudicación. *Pueblo v. García Colón I, supra*, pág. 166; *Pueblo v. Bonilla Romero*, 120 DPR 92, 111 (1987); *Pueblo v. Cabán Torres, supra,* pág. 654. En ese sentido, como foro revisor, al evaluar una determinación sobre una conducta criminal debemos tener presente que la apreciación de la prueba corresponde al foro sentenciador, salvo que se deba revocar porque surgió de una valoración apasionada, prejuiciada o parcializada, o el dictamen es manifiestamente erróneo. *Pueblo v. Toro Martínez, supra*; *Pueblo v. Santiago et al.*, 176 DPR 133, 148 (2009); *Pueblo v. Irizarry*, 156 DPR 780, 789 (2002).

Un juzgador incurre en pasión, prejuicio o parcialidad, cuando actúa movido por inclinaciones personales. *Pueblo* v. *Toro Martínez, supra*, pág. 859 (citando a *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 782 (2013)). Tales motivaciones tienen que llevar al juzgador a adoptar posiciones de preferencia o rechazo hacia las partes, sin admitir cuestionamientos y sin importar la prueba recibida en sala e incluso sin que se someta prueba alguna. Íd. Las conclusiones del foro revisado son erróneas, cuando el foro revisor analiza la totalidad de la prueba y queda convencido de que sus conclusiones confligen con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida. Íd.; *Dávila Nieves v. Meléndez Marín, supra,* pág. 772. El foro primario incurre en un error manifiesto, cuando su apreciación de la prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble. *Pueblo* v. *Toro Martínez, supra,* pág. 859; *Pueblo v. Irizarry, supra*, pág. 816.

**B. La suficiencia de la prueba**

La Sección 11 del Art. II de la Constitución de Puerto Rico, LPRA, Tomo 1, reconoce como imperativo que, en todo proceso criminal, el acusado disfrute del derecho a la presunción de inocencia. En sintonía con nuestra constitución, la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, establece que, "[e]n todo proceso criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en todo caso de existir duda razonable acerca de su culpabilidad, se le absolverá". Por tanto, en nuestro ordenamiento jurídico para que una persona pueda ser declarada culpable de un delito, esta debe demostrarse con prueba suficiente y más allá de toda duda razonable, toda vez que constituye uno de los imperativos del debido proceso de ley. *Pueblo v. Irizarry, supra,* pág. 786; *Pueblo v. De León Martínez,* 132 DPR 746, 764-765 (1993).

A esos efectos, el acusado no está obligado a presentar prueba alguna para defenderse, sino que simplemente podrá descansar en la presunción de inocencia que le asiste. *Pueblo v. Irizarry, supra,* pág. 787. Por ello, la absolución de un acusado debe partir de la consideración serena, justa e imparcial de la totalidad de la prueba desfilada o de la falta de prueba suficiente. Íd., pág. 788. En esa línea, el juzgador(a) de los hechos deberá evaluar la evidencia presentada con el propósito de determinar cuáles hechos han quedado establecidos o demostrados. Esto, con sujeción a los principios que recoge la Regla 110 de las Reglas de Evidencia, 32 LPRA Ap. VI, a saber:

> (C) Para establecer un hecho, no se exige aquel grado de prueba que, excluyendo posibilidad de error, produzca absoluta certeza.
>
> (D) La evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley.

.    .    .    .    .    .    .

(H) Cualquier hecho en controversia es susceptible de ser demostrado mediante evidencia directa o mediante evidencia indirecta o circunstancial. Evidencia directa es aquélla que prueba el hecho en controversia sin que medie inferencia o presunción alguna y que, de ser cierta, demuestra el hecho de modo concluyente. Evidencia indirecta o circunstancial es aquélla que tiende a demostrar el hecho en controversia probando otro distinto, del cual por s[í] o, en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia.

El testimonio de un solo testigo, que le merezca credibilidad al tribunal, será suficiente para derrotar la presunción de inocencia. *Pueblo* v. *Toro Martínez, supra,* pág. 859-860; *Pueblo v. De Jesús Mercado, supra.* Es decir, el testimonio de un testigo principal, por sí solo, de ser creído, y es suficiente para sostener un fallo condenatorio, aun cuando su testimonio no haya sido perfecto, pues corresponde al juzgador de los hechos resolver su credibilidad. *Pueblo* v. *Toro Martínez, supra,* pág. 860; *Pueblo v. De Jesús Mercado, supra,* págs. 476–477; *Pueblo v. Chévere Heredia,* 139 DPR 1, 15–16 (1995).

**C. Instrucciones al Jurado**

La Constitución de Puerto Rico consagra el derecho al juicio por jurado que tiene toda persona que sea acusada por la comisión de un delito grave. Art. II, Sec. 11, Const. E.L.A., LPRA, Tomo 1. En observancia a nuestra ley suprema, se implementó las instrucciones al Jurado. Estas constituyen "el mecanismo procesal mediante el cual los miembros del Jurado toman conocimiento del derecho aplicable al caso". *Pueblo v. Landmark,* 100 DPR 73, 79 (1971). Al respecto, la Regla 137 de Procedimiento Criminal, 34 LPRA Ap. II, establece que las instrucciones deben incluir un resumen de la evidencia y una exposición de todas las cuestiones de derecho necesarias para la información al jurado. Por ello, es importante que el foro primario imparta las instrucciones claras, precisas y lógicas.

Como norma general, las instrucciones al Jurado deben incluir los elementos esenciales de las defensas presentadas por el acusado, así como los aspectos de derecho que, bajo cualquier teoría razonable, pudieran estar presentes en las deliberaciones. *Pueblo v. Acevedo Estrada,* 150 DPR 84, 94-95 (2000). Aun, cuando la prueba de defensa sea débil, inconsistente o de dudosa credibilidad. *Pueblo v. Negrón Ayala,* 171 DPR 406, 414 (2007); *Pueblo v. Miranda Santiago,* 130 DPR 507, 518 (1992). "Ello es así porque corresponde al jurado y no al tribunal rendir un veredicto conforme a la ley y los hechos del caso, según aquél aquilate la prueba y determine los hechos." *Pueblo v. González Colón*, 110 DPR 812, 815 (1991). De manera que, para asegurar un veredicto guiado por el derecho y los hechos, es imprescindible que el Jurado cuente con las instrucciones apropiadas.

Ahora bien, nuestro Tribunal Supremo ha sido enfático en que, el foro primario no debe transmitir las instrucciones si de los autos carece de evidencia que justifique ese veredicto, toda vez que dicha práctica equivaldría a autorizar al Jurado a imponer un castigo diferente al prescrito para el delito que de hecho se cometió. *Pueblo v. Negrón Ayala, supra,* págs. 416-417; *Pueblo v. Moreno Morales I,* 132 DPR 261, 283 (1992); *Pueblo v. Torres Rodríguez,* 119 DPR 730, 744 (1987); *Pueblo v. Prados García,* 99 DPR 384, 395 (1970); *Pueblo v. Serbiá,* 75 DPR 394, 398 (1953).

En casos que se cometa un error sobre alguna presunción en las instrucciones al Jurado, el tribunal apelativo deberá considerar la evidencia que el Jurado consideró al llegar a un veredicto y sopesar el valor probatorio de dicha evidencia contra el valor probatorio de la presunción. *Pueblo v. Colón González,* 209 DPR 967, 992 (2022). Asimismo, para concluir que el error no fue perjudicial, el tribunal apelativo "necesita estar convencido más allá de duda razonable de que, dado lo abrumador del valor probatorio de la

evidencia en verdad considerada por el Jurado comparado con el valor probatorio de la presunción, el veredicto hubiera sido el mismo en ausencia de la instrucción errónea". Íd. (citando a *Pueblo v. Sánchez Molina*, 134 DPR 577, 595 (1993)).

### D. Legítima Defensa

El Artículo 25 del Código Penal del 2012, 33 LPRA sec. 5038, dispone que:

> No incurre en responsabilidad penal quien defiende su persona, su morada, sus bienes o derechos, o la persona, morada, bienes o derechos de otros en circunstancias que hicieren creer razonablemente que se ha de sufrir un daño inminente, siempre que haya necesidad racional del medio empleado para impedir o repeler el daño, falta de provocación del que ejerce la defensa, y que no se inflija más daño que el necesario para repeler o evitar el daño.

> Cuando se alegue legítima defensa para justificar el dar muerte a un ser humano, es necesario creer razonablemente que al dar muerte al agresor, el agredido o la persona defendida se hallaba en inminente o inmediato peligro de muerte o de grave daño corporal. Para justificar la defensa de la morada, vehículo, lugar de negocios o empleo, las circunstancias indicarán una penetración ilegal o que la persona que se halle en la morada, vehículo, lugar de negocios o empleo, tenga la creencia razonable que se cometerá un delito, de acuerdo a lo establecido en el Artículo 25A. Para justificar la defensa de bienes o derechos, las circunstancias indicarán un ataque a los mismos que constituya delito o los ponga en grave peligro de deterioro o pérdida inminente.

En resumen, la concurrencia de los siguientes requisitos es indispensable para que progrese la legítima defensa en los casos en que se ha producido la muerte de una persona:

> (1) [Q]ue la persona tenga una creencia razonable de que se ha de sufrir un daño inminente; (2) que haya necesidad racional del medio utilizado para impedir o repeler el daño; (3) que no haya provocación de quien invoca la defensa; (4) que no se inflija más daño que el necesario para repeler o evitar el daño, y (5) que la persona tenga motivos fundados para creer que al dar muerte al agresor se hallaba en inminente o inmediato peligro de muerte o de grave daño corporal. D. Nevares-Muñiz, *Derecho Penal Puertorriqueño: Parte General*, 3ra ed. rev., Hato Rey, Ed. Inst. Desarrollo del Derecho, 1995, pág. 226-227; Véase, *Reyes Salcedo v. Policía de PR,* 143 DPR 85, 98 (1997).

En sintonía con lo anterior, el Artículo 25A del Código Penal del 2012, 33 LPRA sec. 5038a, nos indica las presunciones sobre legítima defensa:

(a) Se presumirá la razonabilidad de la creencia del actor de que él, u otra persona, está en riesgo de sufrir daño inminente a su integridad corporal, la ausencia de provocación por parte del actor y la necesidad racional del medio empleado y del daño ocasionado para impedir o repeler el daño, si:

(1) el actor sabía o tenía razón para creer que la persona contra quien se usó la fuerza o violencia:

(i) penetró ilegalmente, o intentaba penetrar ilegalmente, al interior de la morada, vehículo, lugar de negocios o empleo, ocupado en tal momento por el actor o la persona a quien el actor protege; y/o

(ii) secuestró o intentó secuestrar al actor o alguna otra persona, del interior de la morada, vehículo, lugar de negocios o empleo del actor o de la persona a quien el actor protege;

(b) La presunción establecida en el inciso (a) no es de aplicación, si:

(1) la persona contra quien se usó la fuerza o violencia tiene derecho a permanecer en, residir, habitar u ocupar legalmente la morada, vehículo, lugar de negocio o empleo donde se usó la fuerza o violencia en calidad de, pero sin limitarse a, dueño, titular, arrendatario, contratista, empleado; o

(2) la persona a quien se secuestre o intente secuestrar es un menor o incapaz, bajo la custodia o tutela legal de la persona contra quien se usó la fuerza o violencia; o

(3) hubo provocación por parte del actor para con la persona contra quien se usó la fuerza o violencia; o

(4) el actor cometía algún delito al momento de utilizar la fuerza o violencia o utilizaba la morada, vehículo, lugar de negocios o empleo para promover actividad delictiva; o

(5) la persona contra quien se usó la fuerza o violencia es un Funcionario del Orden Público, según definido en el Artículo 14 de este Código.

(c) Al causarse la muerte de un ser humano, se presumirá la razonabilidad de la creencia del actor para creer que, al dar muerte al agresor, el actor o la persona defendida se hallaba en inminente o inmediato peligro de muerte o de grave daño corporal si:

(1) el actor sabía o tenía razón para creer que la persona a quien se causó la muerte:

(i) penetró ilegalmente, o intentaba penetrar ilegalmente, al interior de la morada, vehículo, lugar de negocios o empleo, ocupado en tal momento por el actor o la persona a quien el actor protege; y/o

(ii) secuestró o intentó secuestrar; al actor o alguna otra persona, del interior de la morada, vehículo, lugar de negocios o empleo, ocupado en tal momento por el actor o la persona a quien el actor protege;

(d) La presunción establecida en el inciso (c) no es de aplicación si:

(1) la persona a quien se causó la muerte tenía derecho a permanecer en, residir, habitar u ocupar legalmente la morada, vehículo, lugar de negocio o empleo donde se causó la muerte en calidad de; pero sin limitarse a, dueño, titular, arrendatario; o

(2) la persona a quien secuestró o intentó secuestrar es un menor o incapaz, bajo la custodia o tutela legal de la persona contra quien se usó la fuerza letal; o

(3) hubo provocación por parte del actor a la persona a quien se causó la muerte; o

(4) el actor cometía algún delito al momento de causar la muerte o utilizaba la morada, vehículo, lugar de negocios o empleo para promover actividad delictiva; o la persona a quien se causó la muerte es un Funcionario del Orden Público, según definido en el Artículo 14 de este Código.

(e) Para efectos de determinar la procedencia de la legítima defensa, el juzgador de los hechos no podrá tomar en consideración la posibilidad de que el actor pudo haber evitado la confrontación.

[…]

Ahora bien, el estándar para justificar la defensa propia por muerte a una persona debe ser suficiente para excitar el temor de una persona prudente y razonable. *Reyes Salcedo v. Policía de PR, supra*; *Pueblo v. González Román*, 129 DPR 933, 940-941 (1992). De otro lado, al analizar al evaluar la necesidad racional del medio utilizado para impedir o repeler el daño, se deben considerar, la gravedad del ataque, la naturaleza o importancia del bien que se

tutela y las condiciones personales de las partes. *Reyes Salcedo v. Policía de PR, supra,* pág. 99.

### E. Asesinato atenuado

El Artículo 95 del Código Penal tipifica el delito de asesinato atenuado. Al respecto, establece el citado artículo que constituye delito "toda muerte causada a propósito, con conocimiento o temerariamente, que se produce como consecuencia de una perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia [...]". 33 LPRA sec. 5144.

En ese sentido, los elementos del delito son la conducta intencional, ya sea a propósito, con conocimiento o temerariamente, que causa la muerte de una persona, pero, en adición, que existen circunstancias atenuantes importantes, como la súbita pendencia, perturbación mental o emocional suficiente, que hacen que el delito y la pena cambien en favor del acusado. *Pueblo v. Guadalupe Rivera,* 206 DPR 616, 633 (2021); *Pueblo v. Negrón Ayala, supra.* Nuestro Tribunal Supremo, refiriéndose a las frases "súbita pendencia" y "arrebato de colera", reconoció que la circunstancia atenuante en este delito consiste en que el acto del acusado fue una reacción irreflexiva, pasional, súbita e inmediata, provocada por la víctima u otra persona actuando con ésta. *Pueblo v. Negrón Ayala, supra,* pág. 417.

Bajo la normativa anterior, el homicidio –hoy asesinato atenuado–, lo cometía aquel que causando la muerte a otra persona lo hacía "movido por una provocación adecuada de tal naturaleza que lleve a una persona ordinaria a perder su dominio y actuar según sus impulsos mentales causados por la cólera, pendencia o emoción violenta". Íd. De esta forma, se debe analizar si en realidad existió tal provocación o si la misma fue lo suficientemente grave y la actuación fue proporcional al grado de provocación, ya que, de lo

contrario, el acto de dar muerte constituye asesinato, aunque el acusado no hubiese planificado el acto. Íd., pág. 418 (citando a *Pueblo v. Lebrón*, 61 DPR 657, 667 (1943)). En *Pueblo v. Guadalupe Rivera, supra*, pág. 634, el Tribunal Supremo determinó que, como el delito de asesinato atenuado requiere una "perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia", estos principios siguen vigentes.

Al respecto, la Dra. Dora Nevares-Muñiz comenta lo siguiente:

> Bajo el texto vigente en este Código **lo importante será determinar la razonabilidad de la perturbación emocional o mental suficiente ante las circunstancias del caso. La pregunta del juzgador deberá ser si hay una excusa razonable para la perturbación mental o emocional que produjo una muerte, y no si hubo una provocación adecuada o no de parte de la víctima.** La provocación, si la hubo, será un elemento, entre otros, para evaluar si existe una excusa razonable para la perturbación mental o emocional, que justifique atenuar la responsabilidad en el asesinato. D. Nevares-Muñiz, *Código Penal de Puerto Rico Comentado*, Ed. 2019, Inst. para el Desarrollo del Derecho, Inc., San Juan, págs. 161-162. (Énfasis nuestro).

Por lo tanto, según la normativa antes expuesta, para poder determinar si se cometió el delito de homicidio deben darse, como mínimo, los siguientes factores: (i) que la muerte haya ocurrido mientras el actor se encontraba en un arrebato de cólera o pendencia súbita ("*heat of passion*"); (ii) que la muerte estuviere precedida de una provocación adecuada; y (iii) que la muerte haya ocurrido antes de que el arrebato o pendencia sufrida por el actor razonablemente se hubiere enfriado ("*cooling off period*"). *Pueblo v. Rosario Orangel*, 160 DPR 592, 608-609 (2003) (citando a Perkins & Boyce, *Criminal Law*, 3ra. ed., New York, Foundation Press, Inc., 1982, pág. 85; La Fave & Scott, *Criminal Law*, Minnesota, West Publishing Co., 1982, pág. 573; Torcia, *Wharton's Criminal Law*, 15ta. ed., New York, Clark Boardman Callaghan, 1994, sec. 166, págs. 367-69).

**26**

**III.**

En el caso ante nos, el apelante alega como primer señalamiento de error, que el foro primario incidió al no dar una instrucción de legítima defensa al Jurado. Como segundo error, aduce que, no se probó su culpabilidad más allá de duda razonable en cuanto a un asesinato atenuado.

Según hemos adelantado, estos señalamientos de error no se cometieron. Veamos.

El apelante sostiene que la instrucción de legítima defensa estaba justificada en la prueba presentada. Además, aduce que de haberla dado existía una gran probabilidad que el resultado fuera uno distinto. Inclusive, este plantea que la culpabilidad por delito menor de asesinato atenuado evidencia el hecho que el Jurado entendió la existencia de una justificación y la ausencia de elemento subjetivo de ocasionar la muerte.

Ante tales planteamientos, conviene que reseñemos los hechos que surgen de la prueba de cargo, la cual se constituye del testimonio de diez (10) testigos y las admisiones del apelante.

Los hechos revelan que la controversia ante nuestra consideración tuvo su origen el 20 de abril de 2023. Ese día, el apelante estaba cuidando a dos (2) de sus hijos en su residencia. Estando allí, escuchó que estaban cortando pasto con un machete, por lo que, él sale de su residencia, baja hasta la marquesina y observa que está Eggy cerca del camión, sacando unas piezas y colocándolas de frente. Además, este se percató de que el vehículo que estaba allí estacionado era un Toyota Tercel gris, lo cual identificó que este le pertenecía a Eggy, al que ya este conocía por haber sido el dueño anterior de esa finca.

Así las cosas, el apelante decidió subir a su casa y buscó una pistola Taurus, 9 milímetros y se la colocó en el bolsillo izquierdo delantero. Luego, se dirigió a donde estaba el vehículo Toyota Tercel,

y allí este comienza a interactuar con Eggy. El apelante le manifestó y reclamó que las piezas de ese camión no eran de él, y que ese camión no era ni de él ni de Eggy. Por lo que, le reclamó que devolviera las piezas que había sacado del camión. Por consiguiente, Eggy se va caminando hacia su vehículo y el apelante entendió que iba a sacar las piezas del carro para devolverlas.

No obstante, Eggy lo que hizo fue que se montó en su vehículo, pero antes de montarse le dijo: "Tú no sabes en el problema que tú te estás metiendo". Acto seguido, bajó el cristal por dentro y le dijo: "No te preocupes, que yo vengo ahora. Yo vengo con más gente y vamos a resolver este problema". Ante ello, rápidamente, el apelante sacó su pistola y le disparó once (11) veces, ocasionándole la muerte.[107]

Además, surge de los testimonios que, al llegar a la escena el vehículo de Eggy no se encontraba en propiedad privada del apelante, así como que el camión no le pertenecía a ninguno.[108] Además, más de un testigo aclaró que, el bulto que se encontraba en el pasajero frontal, el cual en su interior había una pistola, se encontraba con el *zipper* cerrado.[109] Asimismo, que el machete que se encontraba en el vehículo de Eggy se encontraba bien hundido al lado del asiento del conductor.[110] Por último, que no se encontraron piezas de camión en el interior de vehículo de Eggy, y que tampoco hallaron herramientas para "mecanear".[111]

De conformidad con el estado de derecho reseñado, la legitima defensa es una de las causas para la exclusión de responsabilidad penal. Para que esta proceda debe concurrir los siguientes

---

[107] Véase, Testimonio del Agte. Jesús M. Torres Ramírez, TPO (9 de septiembre de 2024), págs. 206-212.
[108] TPO (5 de septiembre de 2024), págs. 50-51, líneas 10-4.
[109] TPO (4 de septiembre de 2024), pág. 37., líneas 3-13; TPO (6 de septiembre de 2024), pág. 121.
[110] TPO (10 de septiembre de 2024), págs. 233-234; TPO (4 de septiembre de 2024), pág. 37., líneas 3-13.
[111] TPO (10 de septiembre de 2024), pág. 239.

requisitos: (1) que la persona tenga una creencia razonable de que se ha de sufrir un daño inminente; (2) que haya necesidad racional del medio utilizado para impedir o repeler el daño; (3) que no haya provocación de quien invoca la defensa; (4) que no se inflija más daño que el necesario para repeler o evitar el daño, y (5) que la persona tenga motivos fundados para creer que al dar muerte al agresor se hallaba en inminente o inmediato peligro de muerte o de grave daño corporal. D. Nevares-Muñiz, *op. cit.,* pág. 226-227; *Reyes Salcedo v. Policía de PR,* 143 DPR 85, 98 (1997).

Luego de un examen minucioso de la prueba y los testimonios emitidos en el Juicio en su Fondo, revelan que la legítima defensa no se ajusta en lo más mínimo a los hechos de este caso. En primer lugar, esta no procede porque Eggy no se encontraba en propiedad del apelante, y segundo, el camión que comenzó la discusión no le pertenecía a ninguno de estos. Además, entendemos que la manifestación que le hizo Eggy al apelante de "no te preocupes, que yo vengo ahora. Yo vengo con más gente y vamos a resolver este problema", no se debe considerar en lo absoluto que se ha de sufrir un daño inminente. Más aún, cuando el occiso lo que hizo fue encender su vehículo con el propósito de marcharse del lugar. No podemos perder de vista, que Eggy en ningún momento sacó su arma o el machete para amenazar o atacar al apelante. Esto son hechos incontrovertidos que surgen la prueba de cargo e inclusive de la admisión del apelante. De modo que, en virtud de la totalidad de la prueba, los requisitos esenciales para invocar la defensa de legítima defensa no se cumplieron.

En materia de evidencia, el tribunal sentenciador no debe transmitir las instrucciones si de los autos carece de prueba que justifique tal veredicto, toda vez que dicha práctica equivaldría a autorizar al Jurado a imponer un castigo diferente al prescrito para el delito que de hecho se cometió. *Pueblo v. Negrón Ayala, supra,*

págs. 416-417. Por tanto, no incidió el foro primario al no dar una instrucción de legítima defensa al Jurado, ya que esta no surgía en lo más mínimo de la totalidad de la prueba.

En cuanto al segundo error, repetimos que, el apelante plantea que no se probó su culpabilidad más allá de duda razonable en cuanto a un asesinato atenuado.

Según reseñamos, al revisar cuestiones de hecho en convicciones criminales, la apreciación de la prueba corresponde al foro sentenciador y los tribunales apelativos sólo intervendrán con ella cuando exista error manifiesto, pasión, prejuicio o parcialidad. *Pueblo v. García Colón I, supra*, pág. 166. En adición, es sabido que, el testimonio de un solo testigo que le merezca credibilidad al tribunal será suficiente para derrotar la presunción de inocencia. *Pueblo* v. *Toro Martínez, supra,* pág. 859-860; *Pueblo v. De Jesús Mercado, supra.*

En el caso de autos, se presentó (10) testimonios y admisiones del apelante, lo cual todos coinciden que el señor Ruiz Figueroa apuntó y disparó a Eggy, ocasionándole la muerte. Esto, a causa de una discusión entablada por ambos. Conviene mencionar que, de la prueba surge que Eggy y el apelante no llevaban una relación amena. Por lo que, el Jurado razonó que aplicaba el delito menor incluido de asesinato atenuado. Pese a que, desconocemos el análisis del Jurado para llegar a tal conclusión, sería justo concluir que estos entendieron que hubo perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia. Art. 95 del Código Penal, *supra.*

No nos convence el argumento esgrimido por el apelante de que, al Jurado haber emitido un veredicto de culpabilidad por un delito menor incluido, implicaba el resultado hubiese sido distinto si se hubiese dado la instrucción de legítima defensa. Dicho razonamiento resulta jurídicamente insostenible.

Así pues, no nos alberga dudas que, se probó su culpabilidad más allá de duda razonable en cuanto al asesinato atenuado.

**IV.**

Por los fundamentos expuestos, se **confirma** la *Sentencia* apelada.

Notifíquese.

Lo acordó el Tribunal, y lo certifica la Secretaria del Tribunal.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones